## STARR *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 1080. Submitted March 5, 1894.— Decided May 14, 1894.

A warrant issued by a commissioner of a court of the United States is not void for the want of a seal, the commissioner having no seal, and not being required by statute to affix one to warrants issued by him.

The same result is reached under the laws of Arkansas, which prescribed the form of warrant as attested under hand, but not under seal.

The settled rule that where a person having authority to arrest, and using the proper means for that purpose is resisted, he can repel force with force, and, if the party making the resistance is unavoidably killed, the homicide is justifiable, may be invoked by a person who resists and kills the officer if he was ignorant of the fact that he was an officer; and, when such a defence is set up to an indictment for murder, it is error to charge the jury that, if the threatening or violent conduct of the prisoner prevented the officer from giving notice of his official character, he would not be required to give notice.

The possession of a conscience void of offence towards God and man is not an indispensable prerequisite to justification of action in the face of imminent and deadly peril, nor does the intrinsic rightfulness of the occupation or situation of a party, having in itself no bearing upon or connection with an assault, impose a limitation upon the right to repel it.

The motive of a person, accused of murdering an officer trying to arrest him, in being where he was at the time of the killing, has nothing to do with the question of his right of self-defence in itself, and his previous

unlawful conduct should form no element in the solution of that question, except as it throws light on his belief that his arrest was sought by the officer.

While it is well settled in Federal courts that the presiding Judge may sum up the facts to the jury, and express an opinion upon them, he should take care to separate the law from the facts, and leave the latter in unequivocal terms to the judgment of the jury.

The circumstances of this case apparently aroused the indignation of the Judge who presided at the trial of it in an uncommon degree, and that indignation was expressed in terms which were not consistent with due regard to the right and duty of the jury to exercise an independent judgment in the premises, or with the circumspection and caution which should characterize judicial utterances; and this court is constrained to express its disapprobation of this mode of instructing and advising a jury.

HENRY STARR was convicted of the murder of Floyd Wilson, a white man and not an Indian, on December 13, 1892, at the Cherokee Nation in the Indian Territory, and, November 4, 1893, sentenced to be hanged on February 20, 1894, and thereupon sued out this writ of error.

It appeared on the trial that on November 18, 1892, a warrant was issued by a United States commissioner for the Western District of Arkansas for the arrest of Starr and others on a charge of larceny, which was delivered for execution to Henry E. Dickey, a deputy United States marshal; and that the marshal summoned Floyd Wilson, the deceased, as his posse to aid in the execution of the warrant. The evidence tended to show that they proceeded on horseback to the neighborhood of the place where Starr was to be found, and, after visiting several points, came to the house of one Dodge, where they concealed themselves to await his coming; that Starr passed Dodge's house on horseback, whereupon Wilson mounted his horse and pursued him; that the two jumped from their horses and stood facing each other a short time, apparently talking; that it looked as if Starr "was trying to work off away from Wilson," when Wilson mounted his horse again and rode up to within twenty-five or thirty feet of Starr, who made no effort to flee; that Wilson then sprang from his horse, threw his gun to his shoulder and fired at Starr, who was then standing with his gun in both hands holding it down, but, upon Wilson's shooting, returned the

fire and continued to fire rapidly; that Wilson fell, raised himself in a sitting position, jerked his six shooter out and fired four times, when Starr ran up to him and fired point blank into him; Wilson died immediately afterwards. The evidence further tended to show that during the affray Starr fired one shot at the marshal; that he picked up Wilson's gun, found the lever out of order, could not fire it, and turned to go away, and, as he turned, the marshal fired at him; that the marshal's and Starr's horses ran away, but Starr caught Wilson's horse, and, mounting it, rode off. The marshal testified that at the time of this occurrence he had the writ in his possession, and had instructed Wilson as to his duties, and told him, "Now, don't kill this boy if possible to get along without it. We will call on him to surrender."

One Mrs. Padget testified that she saw the transaction from a distance, called a quarter of a mile, and understood Wilson to say: "Hold up; I have a warrant for you;" and that Starr said: "You hold up." She also, in answer to a question put by the district attorney, stated that three or four weeks before the shooting Starr told her that he guessed a marshal named Cowden was hunting for him, "for jumping his bond." And Dickey said in the course of his testimony that he went up in Starr's neighborhood to see a person "shortly after Henry started, got out and jumped his bond."

The witnesses agreed that Wilson fired the first shot, and also that during the time he was riding up to Starr, Starr did not raise his gun or make any effort to stop Wilson. Starr was a Cherokee Indian, and at that time between eighteen and nineteen years of age.

The warrant was signed by Stephen Wheeler, "Commissioner U. S. Court, Western District of Arkansas," and tested as under seal, but no seal was affixed, and counsel for defendant objected to the warrant for the want of a seal, and took exception to its admission on that ground, though in answer to questions by the court they admitted that Wheeler was a United States commissioner for the Western District of Arkansas at the time the writ issued, and that the signature thereto was genuine.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

1. Exception was taken to the admission of the warrant in evidence, and also to the reference thereto as valid process in the charge of the court, upon the single ground that it bore no seal.

It was not contended that a seal is required to such a warrant by any act of Congress or any statute of the State of Arkansas, but the argument is that a warrant of arrest at common law was void if it were without seal, and that the common law rule so asserted was applicable.

In *Padfield* v. *Cabell*, Willes, 411, it was held that a warrant need not be under seal unless required by statute, and Willes, C. J., said: " A warrant does not *ex vi termini* apply to an instrument under seal; it signifies no more than an authority. All the books in which it said that a warrant must be under seal are founded on a case in the year books, 14 Hen. 8, 16, *a*, where it is said that a justice of the peace is a judge of record, and hath a seal of office; and that the inferior officer when he sees the seal must give credit thereto." In *Aylesbury* v. *Harvey*, 3 Levinz, 204, the defendant seized a cup under a warrant by justices of the peace, on a conviction under the excise law, to levy twenty shillings; and in answer to an objection taken to the plea, that the warrant was not pleaded with a profert, the court said: " The statute does not require that the warrant be under hand and seal, but only in writing; and no writing is to be so pleaded, except it be a deed," etc.

Hawkins, P. C. bk. 2, c. 13, § 21, follows Lord Hale in stating the necessity of the seal to a warrant of a justice of the peace, but what Lord Hale says is this (1 Hale, P. C. 577): " It must be under seal, though some have thought it sufficient to

be in writing, subscribed by the justice;" and he refers to
Dalton's Justice, wherein it is laid down that "their warrant
or precept in writing should be under their hand and seal, or
under their hand at least." First ed. 1618, 287. In the third
edition, (1630,) this is repeated, and it is further said: "Also
the warrant of the justice of the peace should be under the
seal of the said justice; for every justice of the peace (being a
judge of record) hath a seal of his office; and when he maketh
a warrant under his seal to the officer, then the officer ought
to give credence to the seal, for that is his authority. *Per
Brudenel,* 14 H. 8, 16."

This was the ground of Lord Coke's statement (2 Inst. 590)
that a mittimus "must be in writing, in the name and under
the seal of him that makes the same, expressing his office,
place, and authority, by force whereof he maketh the mitti-
mus."

Lord Chief Justice Willes, in *Padfield* v. *Cabell,* thus ex-
plains the language of Coke, and points out that Dalton "puts
two instances of warrants only under hands: one by Lord
Chancellor Ellesmere for a contempt, A.D. 1607; the other by
Chief Justice Popham, 3 Jac. 1. There is also reference in
Dalton to two precepts or warrants by justices only under
their hands."

Blackstone states that the "warrant ought to be under the
hand and seal of the justice," (4 Bl. Com. 290,) but Chitty's
note on that passage is that "it seems sufficient if it be in
writing and signed by him, unless a seal is expressly required
by a particular act of Parliament," citing Willes, 411; Buller,
N. P. 83. And this is repeated in 1 Chitty Crim. Law, 38.

In *Davis* v. *Clements,* 2 N. H. 390, it was thought to be
well settled on the authority of the cases in Willes and Levinz,
and Buller's N. P., that a seal was not essential when not
specifically required or provided for; and in *State* v. *Vaughn,*
1 Harp. 313, the Supreme Court of South Carolina announced
a similar conclusion in relation to a warrant of arrest, the
court saying: "There appears to be no reason why the
official act of a magistrate should be under seal, as it derives
its character from the law which prescribes it." The authori-

ties were reviewed by Foster, J., in the carefully considered case of *Millett* v. *Baker*, 42 Barb. 215, and it was held that at common law a seal was not necessary, even in criminal cases, unless required by statute.

We are of opinion that there was no settled rule at common law invalidating warrants not under seal unless the magistrate issuing the warrant had a seal of office or a seal was required by statute, and that the warrant of a commissioner of the United States not having a seal of office, and not being required to affix a seal thereto, cannot be held void for its omission. The same result is reached under the laws of Arkansas, by sec. 1993 of which the requisites and form of warrant, where the offence charged is felony, are given, the form being attested "under hand" but not "under seal." Dig. St. Ark. 1884, 505, c. 46, sub. iv, § 1993; 26 Stat. 81, 96, c. 182, § 33.

2. Counsel for defendant asked the court to give to the jury four instructions. Of these, the first does not appear to have been given, but no exception was taken to its refusal, except as involved in an exception to the action of the court in refusing the request as to all. The court modified the last three and gave them, and the defendant excepted to the modifications and the giving of the instructions as modified in each instance. As the case will be sent back for a new trial on other grounds, we will not review the action of the court in respect of these instructions further than to indicate our views as to a particular modification of instruction numbered 3.

That instruction was as follows, the additions and modifications by the court being italicized :

"The court instructs the jury that if the defendant, being placed in a position in which his life is imperilled, slay an officer of whose official character he has no notice, *or had no reasonable ground to know his character*, this is homicide in self-defence, if the killing was apparently necessary to save the defendant's life, nor does it matter that the officer was legally seeking to arrest the defendant, the defendant having no notice [of that fact] *of the facts or no reason to know what the purpose of the party was : Provided the defendant did not*

*by his threatening and violent conduct prevent the officer from making his character and mission known. This is given in connection with the principle I have given you, that if a man stands up and obstructs arrest, prevents arrest, armed with deadly weapons, and using them in a way that is threatening, then the officer has no time, nor is he called upon to make proclamation. The officer can stand on the defensive and overcome the danger and take his man or overcome him by violence, if necessary.*

"If the jury believe from the evidence that the defendant was placed in a position at the time of the killing in which his life was imperilled by the deceased, and he slew him without having any notice of his official character, and the killing was apparently necessary to save his own life, then the killing of the deceased was homicide in self-defence; nor does it matter that the deceased was legally seeking to arrest the defendant, if the defendant had no notice of the fact, *or no reasonable grounds to know that he was an officer.*

"*It is not necessary to know that it is Floyd Wilson, but an officer. But if the defendant prevented Floyd Wilson from giving notice of his character or mission by threatening or violent conduct, then, of course, he would not be required to give notice. He can stand, as upon the other proposition, on the defensive. These propositions are given on the theory that you believe that no proclamation was made. If a proclamation was made, then the defendant had express notice, he had positive notice, of it.*"

The doctrine expressed in this instruction, as originally drawn, was taken from section 419 of Wharton's Criminal Law, vol. I, p. 419, where many authorities are cited in its support, and was accepted as correct by the learned trial judge. But he felt called upon to qualify it, not only in the direction whether the defendant had reasonable ground to know that Wilson was an officer, but also to the effect that if the accused prevented Wilson from giving notice that he was acting officially, then the rule invoked would not apply. The text-books lay it down as a general proposition that where a person, having authority to arrest and using the

proper means for that purpose, is resisted in so doing, he can repel force with force and need not give back; and if the party making the resistance is unavoidably killed in the struggle, the homicide is justifiable. (1 Russ. on Crimes, 9th Am. ed. 892; Hale, Hawkins, East, and Foster as there cited; 2 Bish. Crim. Law, § 647; 1 Whart. Cr. L. § 415; and cases referred to.) But the question did not arise here in respect of homicide by the officer, but by the person whom he was trying to arrest, and if defendant had no knowledge, was not informed, and was not chargeable with notice of Wilson's mission or official character, the fact, if there was evidence tending to show it, that defendant prevented the giving of notice, had no such relation to defendant's claim of exemption from liability founded on his ignorance and the appearance of the facts to him as to justify the modification.

His conduct was part of the *res gestæ* and important in other aspects of the case, but the qualification went too far as applied to the instruction under consideration.

3. In the case of *Commonwealth* v. *Selfridge* the following propositions were laid down by Mr. Justice Parker, afterwards Chief Justice of Massachusetts: "*First.* A man, who, in the lawful pursuit of his business, is attacked by another under circumstances which denote an intention to take away his life, or do him some enormous bodily harm, may lawfully kill the assailant, provided he uses all the means in his power, otherwise, to save his own life or to prevent the intended harm — such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power. *Secondly.* When the attack upon him is so sudden, fierce, and violent, that a retreat would not diminish, but increase his danger, he may instantly kill his adversary without retreating at all. *Thirdly.* When from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life, or commit any felony upon his person, the killing of the assailant will be excusable homicide, although it should afterwards appear that no felony was intended." (Selfridge's Trial, p. 160.)

The learned judge in his charge in the present case, refer-

ring to the law as thus declared, said: "Now, what is the first proposition? Before I read it I say to you it contemplates a state of actual danger, real danger, in this case to this defendant at the time of the killing, springing from the hands of Floyd Wilson, and danger that he did not create, or bring into existence by a wrongful act of his, because when we undertake to enter upon the execution of as grave a design as the taking of the life of individuals, we must enter upon it with clean hands and a pure heart. If we have created a condition that leads to a deadly result, the law of self-defence does not apply to it; if we create that condition by doing a wrongful thing upon our part which would naturally or reasonably or probably produce a deadly result, the law says there is no self-defence for us, because we are in the wrong in the first place; and especially does that principle apply to a case when we are doing an act which from its nature and the way we are doing it death would be naturally produced in the conflict that may ensue, because of the act that we do. I say, then, we must enter upon the execution of this grave act upon our part with clean hands and a pure heart, or, as this law expresses it, we must be in the lawful pursuit of our business. It says that a man who is in the lawful pursuit of his business — that means doing what he had a right to do — in the right at the time — is attacked by another under circumstances which denote an intention to take away his life, or, it may be, to do some enormous bodily harm, may lawfully kill the assailant — when? — provided he use all the means in his power, otherwise, to save his own life, or prevent the intended harm, such as retreating as far as he can, or disabling his adversary without killing him if it be in his power. Now, that is the first proposition of the law of self-defence. Now, let us see again, by enumerating each condition that must enter into it, what they are. First, we must be in the right; we must be doing what we had a right to do at the time of the killing, and when we are so situated we are attacked by another. How? What sort of attack? . . . Now, in this case, this contemplates as far as this case is concerned, that at the time that Floyd Wilson was killed this defendant was in the right; that he

was doing exactly what he had a right to do, and when so situated he was attacked by Wilson in such a way as to indicate a deadly purpose upon his part."

We presume that the learned judge intended to express the view that the existence of a state of facts which might render the homicide excusable was subject to the qualification that wrongful action on defendant's part towards Wilson did not occasion the attack. But we are of opinion that the language just quoted was open to a different construction and tended fatally to mislead. Whether the right of self-defence is legitimately exercised, depends upon the circumstances of the particular transaction, and we take it that the possession of a conscience void of offence toward God and men is not an indispensable prerequisite to justification of action in the face of imminent and deadly peril, nor does the intrinsic rightfulness of the occupation or situation of a party, having in itself no bearing upon or connection with an assault, impose a limitation on the right to repel it.

This Cherokee, when riding across the country, was entitled to protect his life, although he may have forfeited a bail bond and been seeking to avoid arrest on that account, of which there was some slight evidence incidentally given. But if such were the fact, he could not be considered as doing exactly what he had a right to do, or as having an especially pure heart and clean hands. In a subsequent part of the charge the learned judge said, referring to the defendant: " He was a fugitive from justice if he had jumped the bond he had in this court, as they say; if he had forfeited his bond, and was up in that country hiding out from his usual place of abode to avoid arrest, he was then a fugitive from justice, and you have a right to take that condition into consideration; and in passing upon the question as to what was the probable action of these parties at that time, as to what would be the rights of the officer and of this defendant, you have a right to see this transaction in the condition that surrounded it, and as it was characterized by the position of the parties towards it. You have a right to look at that condition, and see if he was expecting officers to pursue him; if he was hiding away from

them, he was then a fugitive from justice, and if that was true it is a fact that becomes pertinent for you to take into consideration, and the question whether he had reasonable ground from what transpired to know that Floyd Wilson was an officer and was seeking to arrest him." This was duly excepted to, but, apart from the exception, and assuming that the circumstance that he may have anticipated arrest for the reason suggested tended to show that he knew or believed that such was the mission of Wilson, these comments put it beyond question that the defendant was not doing what he had a right to do, and if the jury understood that the scope of what had previously been said embraced the rightfulness of his conduct generally, rather than his conduct in respect of the immediate transaction, they could not but have been materially influenced to his prejudice.

In Selfridge's case, the defendant was walking up State Street in Boston on an errand to the bank, and undoubtedly was in the lawful pursuit of his business when he was attacked, and it was in reference to that fact that the first proposition in the charge in that case was laid down; but here the particular words were inapplicable, and their use calculated to create an erroneous impression.

The motive of the accused in being where he was had nothing to do with the question of his right of self-defence in itself, and the unlawfulness of his previous conduct formed in itself no element in the solution of that question, but was to be considered only in so far as it threw light on his belief that his arrest was sought by the officer.

We are not insensible to the consideration that the learned judge probably did not intend that his words should bear so sweeping a signification, but they were used more than once, and were not withdrawn or so qualified that it can be fairly held that they were not substantially prejudicial.

4. We are compelled to add some further observations in relation to the charge before us.

It is true that in the Federal courts the rule that obtains is similar to that in the English courts, and the presiding judge may, if in his discretion he think proper, sum up the facts to

ᴜɴe jury; and if no rule of law is incorrectly stated, and the matters of facts are ultimately submitted to the determination of the jury, it has been held that an expression of opinion upon the facts is not reviewable on error. *Rucker* v. *Wheeler*, 127 U. S. 85, 93; *Lovejoy* v. *United States*, 128 U. S. 171, 173. But he should take care to separate the law from the facts and to leave the latter in unequivocal terms to the judgment of the jury as their true and peculiar province. *M'Lanahan* v. *Universal Insurance Co.*, 1 Pet. 170, 182. As the jurors are the triers of facts, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments. They should be made distinctly to understand that the instruction is not given as to a point of law by which they are to be governed, but as a mere opinion as to the facts to which they should give no more weight than it was entitled to. *Tracy* v. *Swartwout*, 10 Pet. 80, 96; *Games* v. *Stiles*, 14 Pet. 322. The same rule prevails in the courts of many of the States, and in the charge in *Commonwealth* v. *Selfridge*, referred to by the court below, these views were expressed upon the subject : " As to the evidence, I have no intention to guide or interfere with its just and natural operation upon your minds. I hold it the privilege of the jury to ascertain the facts, and that of the court to declare the law, to be distinct and independent. Should I interfere, with my opinion, with the testimony in order to influence your minds to incline either way, I should certainly step out of the province of the judge into that of an advocate. All that I can see necessary and proper for me to do in this part of the cause, is to call your attention to the points or facts on which the cause may turn, state the prominent testimony in the case which may tend to establish or disprove these points, give you some rules by which you are to weigh the testimony, if a contrariety should have occurred, and leave you to form a decision according to your best judgment, without giving you to understand, if it can be avoided, what my own opinion of the subject is. Where the inquiry is merely into matters of fact, or where the facts and law can be clearly discriminated, I should always wish the jury to leave the stand without being able to ascertain what the

opinion of the court as to those facts may be, that their minds may be left entirely unprejudiced to weigh the testimony and settle the merits of the case."

So the Supreme Court of Pennsylvania says : "When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him ; deductions and theories not warranted by the evidence should be studiously avoided. They can hardly fail to mislead the jury and work injustice." *Burke* v. *Maxwell*, 81 Penn. St. 139, 153. See also 2 Thompson on Trials, §§ 2293, 2294, and cases cited.

It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling. *Hicks* v. *United States*, 150 U. S. 442, 452. The circumstances of this case apparently aroused the indignation of the learned judge in an uncommon degree, and that indignation was expressed in terms which were not consistent with due regard to the right and duty of the jury to exercise an independent judgment in the premises, or with the circumspection and caution which should characterize judicial utterances.

In addition to what has already been quoted, the following remarks, among others, were made :

"How unjust, how cruel, what a mockery, what a sham, what a bloody crime it would be upon the part of this government to send a man out into that Golgotha to officers, and command them in the solemn name of the President of the United States to execute these processes, and say to them, Men may defy you ; men may arm themselves and hold you at bay ; they may obstruct your process ; they may intimidate your execution of it ; they may hinder you in making

the arrest; they may delay you in doing it by threats of armed violence upon you, and yet I am unable as chief executive of this government to assure you that you have any protection whatever." . . . "What was this posse to do? What was he commanded to do? To go into the Indian country and hunt up Mr. Starr, and say to him that on a certain day the judge of the Federal court at Fort Smith will want your attendance at a little trial down there wherein you are charged with horse stealing, and you will be kind enough, sir, to put in your attendance on that day; and the judge sends his compliments to you, Mr. Starr. Is that his mission? Is that the message from this court that is to be handed to Mr. Starr upon a silver platter with all the formalities of polite society? Is that what Floyd Wilson was employed or engaged to do? No. This court did not have anything to do with that command; it does not go in the name of this court; it goes in the name of the chief executive officer, the President of the United States. What does he say, of course acting for the people?" . . . "Without these officers what is the use of this court? It takes men who are brave to uphold the law here. I say, because of this, and because there is no protection unless the law is upheld by men of this kind, if it be true that you are satisfied of the fact beyond a reasonable doubt that Floyd Wilson was a man of this kind, that he was properly in the execution of the high duty devolving upon him, and while so properly executing it by the light of these principles of the law I have given you, his life was taken by this defendant, your solemn duty would be to say that he is guilty of the crime of murder, because if the law has been violated it is to be vindicated; you are to stand by the nation; you are to say to all the people that no man can trample upon the law wickedly, violently, and ruthlessly; that it must be upheld if it has been violated."

These expressions are qualified to some extent by other parts of the charge, which we cannot give at length, but we are constrained to express our disapprobation of this mode of instructing and advising a jury.

Whatever special necessity for enforcing the law in all its

rigor there may be in a particular quarter of the country, the rules by which and the manner in which the administration of justice should be conducted are the same everywhere, and argumentative matter of this sort should not be thrown into the scales by the judicial officer who holds them.

*The judgment is reversed and the cause remanded with a direction to grant a new trial.*