ERMAN PRESLEY, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion filed March 8, 1918.

1. One may lawfully repel an attack upon him, although made by an officer who tries to arrest him, if he does not know

that the person trying to make the arrest is an officer; and this is true regardless of whether or not the party attacked has committed some offense which subjects him to arrest.

2. When an arresting officer makes known his identity, he comes within the protection of the law, and the citizen is bound to submit, at least to the point of ascertaining the character of the charge and the extent of the officer's authority; but when he goes forth upon the public highway confronting travelers with commands to halt, hold up their hands, and so forth, without making known his official capacity, the person accosted has a right to defend himself as a reasonably prudent man would do under similar circumstances unless he otherwise has knowledge of the official capacity of his interceptor.

Writ of Error to Circuit Court for Escambia County, A. G. Campbell, Judge.

Judgment reversed.

*F. W. Marsh* and *H. J. Mackey,* for Plaintiff in Error;

*T. F. West,* Attorney Geenral, and *C. O. Andrews,* Assistant, for the State.

SIMMONS, Circuit Judge—The plaintiff in error, who will hereinafter be called the defendant, was convicted of murder in the first degree in the Circuit Court of Escambia County and sentenced to death. The case is here for review upon writ of error.

There were only two witnesses to the killing—the defendant and a man in company with the deecased—and there is no irreconcilable conflict between their testimony.

The defendant lived in Alabama and came into

Northern Escambia county to visit relatives. His visit was only for a day or two, and, excepting another similar visit, he had never been in Florida. He left the house of his relative about eleven o'clock at night, and was proceeding along a public road toward Flomaton for the purpose of taking the train to his home in Garland, Alabama. Before he reached Flomaton, and when he was near the edge of the "quarters" appurtenant to a sawmill, he was accosted by two strangers, one of whom stepped in front of him and commanded him to stop. At this time the defendant was carrying a pistol in his hand at his side. D. G. Nelson, who was with the deceased at the time, took the stand as a witness for the State, and described the occurrence as follows: "When we came up in I suppose thirty or forty feet of him— of Erman Pressley, Mr. Pickering says to me: 'Look there.' And the first thing I noticed he had his hand like this (indicating) and I saw he had a pistol in his hand. Mr. Pickering didn't say anything more to me at all, didn't never speak to me again. When he got even with this negro he told him to stop and the negro didn't do it, he kind of sidled around, he told him the second time to stop, he still didn't stop, he backed off and changed his pistol from his left hand to his right, then Mr. Pickering told him a third time to stop, and when he told him a third time he was then, I suppose about as far as from—about ten or twelve feet off, and the negro raised his pistol like that (indicating) and when Mr. Pickering went after his gun in his pocket like that (indicating) and when he started to pull his gun out the negro fired, and then they commenced firing and I fell outside of the road, I had nothing to defend myself with and I fell right outside of the road to keep from getting hit myself."

The defendant testified that the deceased told him to hold up his hands the second and third times he spoke to him, and on cross-examination this same witness, Nelson, speaks of "the second time Mr. Pickering told him to hold up his hands." The defendant further testified that he did actually hold up his hands and that the deceased shot at him twice before he took them down, one of the shots taking effect in his wrist. In corroboration of this testimony of the defendant, Dr. F. L. Abernathy, another witness for the State, testified that the defendant, upon reaching Flomaton, called upon him for professional services, and that he was suffering from a bullet wound, the bullet having "entered on the inner side of the wrist, and came out at the base of the negro's little finger." This is about such a wound as one would expect from a bullet if it came from the front and struck an upheld hand. Dr. W. L. Andress, the prison physician, was of the opinion that the bullet traversed the wound from the opposite direction.

This statement contains all the testimony concerning the actual killing. And it presents the testimony of the witness Nelson in its aspect most favorable to the State. He weakened considerably on cross-examination; not that he seemed reluctant to tell the whole truth when interrogated, but in his direct and voluntary statement he very naturally remembered most vividly those things which might in some way favor his deceased friend.

There was some additional testi⸱ ony, brought out upon cross-examination of Ernest Lassiter, brother-in-law of the defendant, to the effect that he had warned the defendant to go to Flomaton by an obscure road, because there was always someone out there on the public road "meddling with strangers" at night.

The deceased was a deputy sheriff, and he had been

out looking for a man whom he had a warrant. Nelson went along merely in the capacity of friend. But neither of them seems to have mistaken the defendant for the man whom they were seeking, nor did they by any word or token inform him that either of them was a deputy sheriff. The testimony is to the effect that they had never seen the defendant before, and that he had never seen them.

The contention of the State is that the defendant was violating the law by carrying a pistol in his hand without first procuring a license to carry it, and that the warning of his brother-in-law ought to have been sufficient to inform him that the "meddlers" were sheriffs.

It has long been the settled law in this country that one may lawfully repel an attack upon him, although made by an officer who tries to arrest him, if he does not know that the person trying to make the arrest is an officer. This is true regardless of whether or not the party attacked has committed some offense which subjects him to arrest. Starr v. United States, 153 U. S. 614, 14 Sup. Ct. Rep. 919.

The case of Miller v. State, decided at the present term of this court is very much in point, and in that case the authorities are gathered and examined.

It is very necessary that officers of the law be protected against violence at the hands of the lawless, both white and colored; but in order to come within the protection of the law they must make known their official capacity before exercising their prerogative of arrest with the attendant assault. Upon thus making themselves known they come within the protection of the law, and the citizen is bound to submit, at least to the point of ascertaining the character of the charge and the extent of the officer's authority. But when an officer

goes forth upon the public highway confronting travelers with commands to halt, hold up their hands, and so forth, without making known his official capacity, the person accosted has a right to defend himself as a reasonably prudent man would do under similar circumstances, unless it be shown that he otherwise had knowledge of the official capacity of his interceptor.

Whatever there may be of racial or caste distinctions in other realms of society, all men are equal before the law in the matter of security for their persons and property, and this right to repel unexplained assaults is no less the right of the humblest citizen of the land than of the highest.

It is urged by the State that the question of whether or not the defendant knew his interceptor to be an officer of the law was a question of fact for the jury. This would be true if there were any conflict in the evidence at this point, or any testimony that he had such knowledge. But even admitting that his brother-in-law told him that deputy sheriffs were likely to arrest him, he would nevertheless have had a right to presume that they would approach him in a proper and legal manner, and would have been warranted in repelling the assault made in the manner it was unless he had acquired actual knowledge in some other way that he was being halted by an officer.

Various assignments are based upon the refusal of the court below to give certain charges requested by the defendant; but a careful consideration of the entire charge of the court shows that every point made by these refused charges was fairly presented to the jury in other parts of the charge, with the exception of requested charges 17 and 18, covered by assignments 45 to 48 inclusive.

It is not necessary to quote these requested charges 17 and 18. It is sufficient to say that they question the validity of Section 3267 of the General Statutes, 1906, which prohibits the open carrying of a pistol or repeating rifle without first procuring a license therefor from the County Commissioners. The point is pertinent because the State insists that the defendant was subject to arrest upon this charge, and that he therefore killed Pickering while resisting lawful arrest.

The question of the constitutionality of the section of the General Statutes here under consideration is a vexed question upon which the courts of the country are by no means in accord. And while it is a question upon which this court has not passed, it ought not to be decided upon a collateral attack unless such decision is necessary in disposing of the instant case. There is no necesisty for such decision here; because it may be admitted for the moment that Section 3267 is valid, or, on the other hand, that it is invalid, without in any way affecting the case at bar. If it be held invalid, then the defendant had a right to carry the pistol in his hand, as it is testified he was carrying it when accosted. If it be held valid, then he might have been committing a misdeᴛeanor by carrying the pistol without a license, if he was in fact carrying it without a license.

But, even admitting that the defendant was committing a misdemeanor in carrying the pistol, this fact would not justify the manner in which the deceased accosted him. In the case of Starr v. United States, *supra*, Chief Justice FULLER crystalized the law of this subject by saying that the intrinsic rightfulness of the occupation or situation of a party, having in itself no bearing upon or connection with an assault, does not impose a limitation upon the right to repel such assault.

In other words, the mere fact that a man may be subject to arrest for violation of some penal statute does not put him to the necessity of submitting to unexplained interceptions and assaults by strangers whom he meets on the public highway.

The remaining assignments of error have been examined and found to contain no reversible error. But the testimony is utterly insufficient to sustain the verdict of murder in the first degree, and the court below erred in denying the motion for new trial on that ground. Baker v. State, 54 Fla. 12, 44 South. Rep. 719.

The judgment of the court below is reversed, and the case is remanded for further proceedings not inconsistent herewith.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.