**Louis J. GARIEPY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 12061.**

United States Court of Appeals, Sixth Circuit.

March 9, 1955.

James E. Haggerty, Harry M. Nayer, Detroit, Mich. (Harry Cohen, Edward P. Echlin, Detroit, Mich., on the brief), for appellant.

George E. Woods, Detroit, Mich., William A. Barnett, Chicago, Ill., Regional Office Int. Rev. Dept. (Fred W. Kaess, Detroit, Mich., John D. Kiley, Regional Counsel, Chicago, Ill., on the brief), for appellee.

Before MARTIN, McALLISTER and STEWART, Circuit Judges.

MARTIN, Circuit Judge.

Appellant, Louis J. Gariepy, a Detroit doctor specializing in surgery and enjoying a lucrative practice, was convicted by jury verdict on two counts of an indictment charging him with violation of section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b). He was sentenced to four years' imprisonment on each of the two counts, the sentences to run concurrently, and was fined $5,000 on each count. His office nurse and confidential financial secretary, Marie L. Loechner, who had been jointly indicted with him, was acquitted by the verdict of the jury.

Before returning its verdict, the jury inquired as to whether it "could return a verdict of guilty as to one of the defendants and make a recommendation of mercy." The judge replied affirmatively, but told the jurors that the recommendation would not be binding upon the court. He assured them, however, that their recommendation would be given "full consideration in any consequences that may follow." When subsequently pronouncing sentence on appellant, the judge stated that he had considered the probation report and, "chiefly," the recommendation of mercy made by the trial jury. He asserted that the evidence of guilt of the appellant was overwhelming, and that had the jurors failed to return a verdict of guilty they would have violated their oaths and simply would have pardoned the defendant. He said that appellant had had a fair trial and that his rights had been properly protected, "both by eminent and able counsel and also by the court."

The court was impelled to find that appellant had committed perjury, inasmuch as he knew that he had understated his income; that the doctor had wilfully thrown obstacles in the way of the investigating officers over a long period of time; that he had deliberately destroyed his records and thereby prevented the revelation of the extra sums of money which he had received; and that he had done this after the revenue officers had visited his offices for the purpose of examining his records. The judge considered that he would be recreant in his duty if he failed to impose a sentence which the facts required—not only because the defendant was a man of high reputation in his community, but also because of the example set for peo-

ple of no influence who would be brought before the criminal bar of the court.

The income tax returns of Dr. Gariepy for the respective years involved—1945 and 1946—were not signed by him, but had been prepared by his employee, the Rex Beasaw Income Tax Service, from information obtained from the co-defendant, Marie Loechner, who had secured the data in the defendant's office and from the so-called Rex "black books" which were daily record books of receipts and disbursements. The entry of income had been regularly made by Mrs. Lucille Baldinger, receptionist and book-keeper for the doctor during 1945 and until August of 1946. Disbursements had been entered in these books by Miss Loechner. Payments for major surgery, however, had been deliberately omitted from the "black books" during 1945 and partially during 1946, although, in the latter year, some surgical fees had been entered. The appellant had directed the transmission of the information furnished the Rex Beasaw Service. The record discloses that he was informed as to the system of bookkeeping employed in his office and kept in touch with his business records.

Mrs. Baldinger testified that appellant would "glance" at her entries in the black books and that on one occasion when he observed that the entry of a surgical charge had been made in one of these books had said: "That should be on the account sheet and filed in the closet." The witness testified further that she would either place the account sheets on Dr. Gariepy's desk with the mail, or would take them into his office and show them to him. These were the yellow account sheets on which surgical charges were entered. They were kept, so she said, in a filing cabinet in a closet of the front office. The surgical cases and the non-surgical cases were handled in an entirely different manner, the record of surgical cases being placed in the closet at the end of each day. The open account sheets were kept in the top section of the cabinet and the closed accounts in the bottom section.

Both Dr. Gariepy and Miss Loechner had informed Mrs. Baldinger of the payment of surgical fees so that she could make appropriate entries on the account sheets kept in the closet. Mrs. Baldinger testified that at the end of each day, she would put into a large envelope all the checks and cash received by her during that day, with a notation of the total amount, and would give the envelope to Dr. Gariepy before he left the office. Dr. Gariepy stated that he turned over these receipts to his wife, who made the bank deposits. When she was out of town, a long-time associate of his in the x-ray department would substitute for her in making the deposits.

Revenue Agent Price testified that, when the government investigation began, he was told by Dr. Gariepy that his entire set of books consisted of the "black books" and a commercial check book. When he questioned Dr. Gariepy about his accounts receivable, the doctor stated that he destroyed the record of an account when it was paid; and that he did not maintain an accounts receivable ledger, or duplicate receipts. The revenue agent was shown a sample of the yellow cards upon which patients' accounts are kept, but was told by the doctor that, because the medical history of the patients appeared on the cards, they could not be made available to the agent. When the doctor was informed that it would be necessary to inspect the hospital records in order to determine his income, he admitted that he had duplicate receipts and suggested that these be used by the investigators for that purpose. Shortly thereafter, he stated that he could not furnish the receipt books because they had been destroyed. He explained that Special Agent Kitchen, who was not investigating his returns, had telephoned him concerning the tax liability of his brother; and that the agent informed him that his [appellant's] income tax had been closed and that it was, therefore, unnecessary that the doctor preserve these records. Special Agent Kitchen denied that he had made any such statement to Dr. Gariepy.

The most convincing evidence of Dr. Gariepy's guilt was that, after he knew his income tax returns were being investigated, he deliberately removed from the closet in his office the yellow sheet records of his paid surgical fees and transferred them to the attic of his home. He admitted that he had personally transported them in suitcases at intervals and had permitted them to be destroyed while his house was being cleaned and redecorated. The jury obviously did not believe his rather incredible excuse for destroying important records— that a revenue agent who was not even working on his case had told him that the case against him was closed.

Numerous patients of Dr. Gariepy were called as government witnesses and testified that, during 1945 and 1946, they had made payments to the doctor, or to his nurse or other representatives, for professional services in various amounts from $50 to $500. Most of these patients had receipts or cancelled checks in support of their testimony. The inference is plain, therefore, that payments made to the doctor for professional services to these patients had not come from and were not made by insurance companies listed on Exhibits 112 and 113, which were made up by the revenue agents from information in the insurance record books kept by Miss Loechner.

Revenue Agent Philpott testified that, upon examination of the black books, he had found no reference to the payments which the patients claimed to have made. He swore that in numerous instances he found an entry, "NC," in the receipt column of a patient who testified that he, or she, had paid the doctor. Dr. Gariepy explained that the entry "NC" meant that no charge had been made. The witness, Philpott, testified further that an examination of the duplicate receipt book covering the period from August 3 to August 21, 1945, showed fourteen duplicate receipts ranging in amount from $27 to $250. These had not been recorded in the black books. He found four items, corresponding in date with the date of receipts, carrying the entry "NC" following the respective names of the patients.

Another government witness testified that he had computed the additional income revealed by testimony of patients and found that Dr. Gariepy's unreported income amounted to $18,255 for 1945 and $11,733 for 1946. From this, he calculated that the doctor's tax had been understated on his 1945 return by $13,605.-85 and, on his 1946 return, by $5,025.88.

After hearing the testimony of the income tax examiners, co-defendant Loechner changed her story from that originally told by her to the government examiners and also from that told to the examiners by Dr. Gariepy and his then attorney. She testified that she took the total of the black books, the total of the yellow sheets less the Michigan Medical Service total, and submitted this information, along with the information from Form 1099 sent by the Michigan Medical Service, to the Beasaw office; and that she used the insurance memorandum books [from which Exhibits 112 and 113 were compiled] in preparing information for the tax returns. Her testimony concerning receipts from surgical fees and payments made by insurance companies was contradicted by many patients who had paid surgical fees without benefit of any insurance or with the aid of the Michigan Medical Service. Her testimony was also contradicted by a representative of the Michigan Medical Service. Of some seventy patients who testified, many said that, in 1945, they were not insured at all but had paid Dr. Gariepy for professional services. Others of them testified that they were insured by Michigan Medical Service and had paid Dr. Gariepy specified amounts. The total of these payments to the doctor aggregated $8,965. Thirty-five patients swore to a total of $5,506 for the year 1946, paid either from their own funds or by Michigan Medical Service. Miss Loechner's testimony concerning the fees and the insurance records was confused and confusing, boiling down to an admission that she did not know where she got the information con-

tained in the records. The record in the case reveals that she said: "Where I got the information that I recorded in that insurance—and I add the word 'surgery' now, I don't know anywhere in particular, except I do know what the amount was taken in from surgery. I got the information from the yellow account sheets. How I knew when I went to the yellow account sheets, that an item that I picked from the yellow account sheet was to go under American Medical Society I didn't know. As I said before, there was no reason for that book. That book had nothing to do with it. I have no reason for it. Why I made such a list I don't know. There is no particular reason, except one thing, as I said before, those insurance companies that different patients had had association with and they were on their charts or account sheets. When I made a list up of those patients from the account sheets right now I wouldn't know from the account sheet under what company to put them. There was no reason. As I say, that had nothing to do with the income tax." The yellow sheets about which she testified so glibly were those destroyed by Dr. Gariepy.

■ We think there is unquestionably substantial evidence that appellant Gariepy caused his income tax returns for the years in question to be understated in a deliberate and wilful effort to evade taxes. He was not wholly unacquainted with a simple system of accounting, as evidenced by the fact that when working in a drug store before becoming a doctor he made bookkeeping entries in his employer's records. His testimony disclosed that he was well acquainted with the method by which his books were kept; and that he well understood the difference between a day book and a ledger sheet. He testified that all the money received from his professional services was reflected in ledger sheets, except such portion thereof as was recorded in the Rex Beasaw books. He said that "by adding the Rex books and the ledger sheets you got the total amount." He admitted that he had been given by Mrs. Baldinger, at the end of each day, all checks and cash taken in. He swore that he had not included in the black books all the monies which he received, for the reason that the ledger sheets reflected all such money not appearing on the black Rex books. He knew that to get a complete accounting of the total amount of money received by him in any one year would require the addition of the sums shown on the account ledger cards and the receipts appearing in the black books; and, yet, while the accuracy of his income tax returns for 1945 and 1946 were in serious question, he permitted these all-important ledger sheets to be destroyed after he had deliberately removed them from his office to the attic of his home. Not until after he was informed that the investigation would require contact with his patients to ascertain what they had paid him did he reveal the fact that he had kept duplicate receipt records.

The doctor told Revenue Agent Price that he maintained a record of accounts receivable but destroyed the record when an account was paid. He preserved records of unpaid accounts only. In January of 1947, Dr. Gariepy commenced transferring the information on the yellow cards to new records and carried the old records home.

The government obtained from Mt. Carmel Hospital a list of the doctor's patients and sent them questionnaires in an effort to determine his correct income. One of these patients testified that when she received the questionnaire she telephoned the doctor and asked him what to do with it. He told her to send it to him. She did. When it was returned to the Bureau of Internal Revenue, there was typed on it: "I do not remember the dates. I do not keep my receipts longer than one year." The patient testified that she had not typed this statement on the questionnaire. Another patient stated that when he received the list of questions he took it to Dr. Gariepy and inquired about it. The doctor told him that it was just a routine check-up and to forget it. The doctor stated that

he would take care of it, then tore up the questionnaire and threw it into a wastebasket. These two incidents, coupled with the other evidence, were incriminating.

■ Under the authorities, the conduct of Dr. Gariepy was of such character as to support a plain inference that he wilfully attempted income tax evasion. As was said in Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418: " * * * By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."

As authority for the proposition that the jury in the instant case had substantial evidence upon which to convict appellant of wilful income tax evasion and that the district judge properly denied the motion of appellant for judgment of acquittal made at the close of the government's case and renewed when all the evidence in the case had been received, see opinions of this court in Battjes v. United States, 6 Cir., 172 F.2d 1; Gariepy v. United States, 6 Cir., 189 F. 2d 459, 463, wherein conviction of appellant's brother for income tax evasion was affirmed. See illustrative authorities from other circuits: Kobey v. United States, 9 Cir., 208 F.2d 583; United States v. Lange, 7 Cir., 161 F.2d 699, 704; Myres v. United States, 8 Cir., 174 F.2d 329, 336, certiorari denied 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Olson v. United States, 8 Cir., 191 F.2d 985, 989; Sasser v. United States, 5 Cir., 208 F.2d 535, 539; Barshop v. United States, 5 Cir., 191 F.2d 286, 293, certiorari denied 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 688; Maxfield v. United States, 9 Cir.,

152 F.2d 593, 597, certiorari denied 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021.

Appellant avers that the district court erred in denying his challenge to the array of the petit jury panel, for the reason that the entire panel was drawn from Wayne and Oakland Counties, which constitute only two of the sixteen counties comprising the Southern Division of the Eastern District of Michigan. The indictment and trial of appellant's brother, Dr. Bernard Gariepy, had received unusual publicity in newspapers published in Wayne and Oakland Counties, as well as from radio and television. After conviction of appellant's brother, Gariepy v. United States, 6 Cir., 189 F. 2d 459, supra, the indictment of appellant for income tax evasion had been predicted by radio broadcast, as well as in newspapers published in Detroit. There was no professional association between the brothers Gariepy and, as alleged in the affidavit in support of the challenge to the panel array, there had been no "fraternal association" between them for more than fifteen years. Undoubtedly, appellant received bad press notices in Detroit, where he was engaged in practice.

The pertinent Code provision is that both grand and petit juries shall be selected from such parts of the district as the court directs, so as to be most favorable to an impartial trial, and not to incur unnecessary expenses or unduly burden the citizens of any part of a district with jury service. Section 1865(a), Title 28 U.S.C.A.

Appellant cites Delaney v. United States, 1 Cir., 199 F.2d 107, 113; Frantz v. United States, 6 Cir., 62 F.2d 737, 738; Walker v. United States, 9 Cir., 116 F. 2d 458, 462, and Local 36 of International Fishermen, etc., v. United States, 9 Cir., 177 F.2d 320, 338–342 [opinion written by the designated trial judge in the instant case]. In the first cited authority (Delaney), the court said that it was not "a case of pre-trial publicity of damaging material, tending to indicate the guilt of defendant, dug up by the initiative and private enterprise of newspapers",

but was a case where the United States, through open committee hearings in its legislative department shortly before the trial of a pending indictment, had caused and stimulated "massive pre-trial publicity, on a nationwide scale." The Frantz and Walker cases carry no further than to support the power of the trial court to exercise discretion in the matter of summoning jury panels.

■ Appellant emphasizes the opinion of this court in Marson v. United States, 6 Cir., 203 F.2d 904, 909, wherein we reversed a conviction in a criminal case because of the refusal of the district judge to interrogate the jurors to ascertain whether they had been prejudiced by reading a newspaper article that linked the defendant's name with those of two convicted criminals. In that case, moreover, we held that the judge had examined the jurors on voir dire in a manner highly prejudicial to the defendant and had refused to question the jurors in compliance with proper motions made by defendant's counsel. The action of the judge in the Marson case is in no wise comparable to the situation found here. The record fails to show that the examination of jurors in the instant case was in any manner improper. Inasmuch as no showing has been made of abuse of the court's discretionary power, no error is found in the action of the trial court in denying appellant's challenge to the array. See United States v. Gottfried, 2 Cir., 165 F.2d 360, 363, 364, certiorari denied 333 U.S. 860, 68 S.Ct. 738, 92 L. Ed. 1139, rehearing denied 333 U.S. 883, 68 S.Ct. 910, 92 L.Ed. 1157.

■ Appellant urges that the instant indictment cannot sustain his conviction under section 145(b) of the Internal Revenue Code "where the only means of the attempt to defeat and evade income taxes" alleged was the filing of unsigned tax returns. He draws a distinction between the misdemeanor with a maximum penalty of one year's imprisonment and a fine for wilful failure to file a return, as defined in section 145 (a), I.R.C., and the felony defined in section 145(b) of the Internal Revenue Code, in the wilful attempt to evade or defeat the payment of income taxes. He relies principally upon the opinion of the Supreme Court in the Spies case, 317 U. S. 492, 63 S.Ct. 364, 368, 87 L.Ed. 418. A careful reading of the opinion in that case does not warrant the inference which appellant seeks to draw from it. Mr. Justice Jackson declared that a wilful attempt to defeat or evade taxes may be accomplished by "any conduct, the likely effect of which would be to mislead or to conceal." See United States v. Smith, 3 Cir., 206 F.2d 905; Montgomery v. United States, 5 Cir., 203 F.2d 887, 889. Compare Emmich v. United States, 6 Cir., 298 F. 5, 9. Here the attempted evasion was accomplished by appellant's filing with the Collector of Internal Revenue false documents which purported to be income tax returns. See also United States v. Beacon Brass Co., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61. The indictment was sufficient to inform the accused of the crime charged, so that he could adequately prepare his defenses and could plead the judgment in bar of another trial for the same offense. United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619. This doctrine is so well established in this jurisdiction and elsewhere as to require no repetition here of authorities so often cited.

■ Appellant argues that the "purported" returns did not constitute income tax returns under the law; that the filing of the unsigned documents did not constitute the commission of an affirmative act requisite to sustain conviction under section 145(b). We think this contention runs contrary to the holding of this court in Emmich v. United States, 6 Cir., 298 F. 5, 9, where it was said: "The real character of the offense lies, not in the failure to file a return, or in the filing of a false return, but rather in the attempt to defraud the government by evading the tax." The specious contention of appellant comes rather late. At the trial, he did not deny that the documents filed with the Collector of Internal Revenue on his behalf were in fact

income tax returns. Indeed, he identified the documents as his income tax returns for 1945 and 1946 and denied that he had purposely omitted signing the returns; and, in respect of the 1946 return, stated that the tax was paid by his wife in conformity with the return.

█ Appellant insists that the following sentence in the charge of the court to the jury constitutes reversible error: "The defendant Gariepy must be taken to have had knowledge that his income for the calendar years 1945 and '46 was as stated by the accountants in the purported tax returns for those years respectively." The opinion of this court in Lurding v. United States, 6 Cir., 179 F.2d 419, 421, 422, is cited as direct authority for reversal. There, we said that the "doctrine of *respondeat superior* is not to be drawn from the law of negligence and applied to criminal liability." But we said, further, that the fact that the taxpayer did not make out the return "becomes immaterial only when the government has established, by direct proof or by circumstances, that the taxpayer knew or perhaps should have known that the return was false." Lifting out of context an isolated paragraph of a charge as a basis of complaint that the selected statement constitutes reversible error, where the charge in entirety fully and adequately protects the lawful rights of the appellant, does not meet our approbation. The instructions of the experienced trial judge made it clear that Dr. Gariepy should not be convicted unless it was proved by convincing evidence beyond any reasonable doubt that his conduct constituted a knowing and wilful attempt to defeat and evade his lawful income taxes.

The jurors were told, *inter alia*, that: "Before the defendant can be found guilty, you must find beyond a reasonable doubt such omissions, if any, had been made with the specific intent to defeat and evade part of the income tax due and owing for the particular year in question." And, following the paragraph of the charge of which complaint is made, the judge instructed: "The defendant cannot be held guilty simply because he was a poor bookkeeper or that there were poor office systems in practice in his office, or that he was pressed by the amount of business that he was doing, if you find such is the case; but you must find that the returns for the year in question failed to reflect the amounts of money received knowingly and wilfully. It must be proved beyond a reasonable doubt that the defendant knew that substantial sums of money received by him from patients for surgery were not placed of record in such a manner that these payments would be reflected in his income tax return. If you find that substantial amounts both in number and in volume were actually paid to the defendant Gariepy either personally or through the defendant Loechner, or to any other person, and of which he knew that such amounts were not shown to be included on the purported tax return, you may consider whether the defendant knew such amount was not being reported on the purported tax return, and then you will consider the question of wilfulness. * * * but you cannot find the defendant Gariepy guilty unless you find beyond a reasonable doubt that he had knowledge that he received more money than that reported and wilfully attempted to defeat and evade the tax imposed thereon in the manner charged in the indictment. * * * It must be proved that the defendant acted not only knowingly, as I said above, but that he has acted wilfully in an attempt to evade and defeat a particular tax charged or a portion of it. * * * Wilfulness is an essential element of the crime charged. Wilfulness is the state of mind of the defendant where he is fully aware of the existence of a tax imposed upon him by the law which he seeks to evade or defeat. Wilful evasion requires an intentional act or omission as compared to an accidental or inadvertent. It requires a specific wrongful intent to defeat or evade the tax obligation known to exist. * * . * There can be no crime without a criminal intent, as the court has just now instructed you, and in this

case, the specific intent is necessary to constitute the crime under the charge made in the indictment."

■■ No exception was taken by appellant's attorneys to the paragraph of which complaint is now made. Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides that error cannot be assigned to any portions of or omissions from a charge, unless objection thereto is made before the jury retires. The rule requires that the grounds for the objection be stated distinctly. We agree with the expression in United States v. Raub, 7 Cir., 177 F.2d 312, 315, that Rule 52(b) should not be lightly invoked. That rule gives the appellate court discretion to notice plain errors or defects affecting substantial rights. See Paschen v. United States, 7 Cir., 70 F.2d 491; Barshop v. United States, 5 Cir., 191 F.2d 286, certiorari denied 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 688; Norwitt v. United States, 9 Cir., 195 F.2d 127, certiorari denied 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 635; Norris v. United States, 2 Cir., 205 F.2d 828.

■ Appellant assigns error on the part of the court in charging the jury that the duty of filing a correct and accurate income tax return was personal to the appellant and could not be delegated. This assignment of error is, likewise, based on no exception taken at the trial. The law did impose a non-delegable duty upon appellant to file a correct and accurate income tax return; and, in the entire context, as has been plainly indicated heretofore, the appellant was given in the court's charge to the jury the benefit of accurate and fair instructions which adequately protected his interests. Banks v. United States, 8 Cir., 204 F.2d 666, 673, certiorari denied 346 U.S. 857, 74 S.Ct. 73, 98 L.Ed. 370; Beaty v. United States, 4 Cir., 203 F.2d 652; Paschen v. United States, 7 Cir., 70 F. 2d 491, 499.

■ Complaint is made of alleged error in the court's charge when the jurors were told that evidence of previous good reputation "may not only raise a doubt of guilt, but may, *in connection with all the other evidence in the case* [emphasis added], bring conviction of innocence", with the added comment, "however, persons of previous good reputation have been known to commit crimes." The assignment of error is not well taken. See Colbert v. United States, 79 U.S.App.D.C. 261, 146 F.2d 10, 11; United States v. Antonelli Fireworks Company, 2 Cir., 155 F.2d 631, 639. These cases, we think, correctly interpret the expression of the Supreme Court in Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467. As was stated in the Antonelli case, supra, the effect of the Edgington case, by net balance, seems to be that a trial court should not tell a jury to consider character evidence only when the scales are in balance.

■ The district court was not in error in rejecting appellant's special requests to charge, numbered respectively XXV, pertaining to reputation evidence, and XXVI, pertaining to reasonable doubt. The proposition pertaining to XXV has been discussed. As to XXVI, the court accurately charged concerning "reasonable doubt." Appellant avers that the charge of the district court was "erroneous, confusing and contradictory, when it charged (1) that the alleged offense could be committed in *any* manner, and (2) that it could only be committed *in the manner alleged in the indictment."* [Emphasis supplied.] Again, in a strained effort to charge error, the appellant lifts out of context a portion of the court's instructions to the jury. The charge, read as a whole, was both clear and correct. The jury was told specifically: "You cannot find the defendant Gariepy guilty unless you find beyond a reasonable doubt that he had knowledge that he received more money than that reported and wilfully attempted to defeat and evade the tax imposed thereon *in the manner charged in the indictment."* [Emphasis added.] The defendant failed to take exception to the portion of charge of which complaint is now made, thus again failing to observe the require-

ment of Rule 30, Federal Rules of Criminal Procedure.

■ Appellant complains that the district judge erred when, in responding to the jury's inquiry, he instructed that one defendant could be convicted by them with a recommendation for leniency. The judge was scrupulously careful and accurate in answering the jury's inquiry as he did. Compare Burchman v. United States, 82 U.S.App.D.C. 283, 163 F.2d 761, 762; United States v. Parker, 3 Cir., 103 F.2d 857, 863.

Appellant urgently insists that the trial judge committed reversible error in shutting off cross-examination of J. G. Philpott [a special agent and group supervisor of the Internal Revenue Service at Detroit] concerning reports by government agents working under him as to payments alleged to have been made to Dr. Gariepy by various insurance companies. The subject matter was important, in that the theory of the government was that the amounts of money reflected in the doctor's black books and on the "insurance lists" [prepared by government agents from a "memorandum" book, or books, made up by the doctor's nurse, the co-defendant Marie Loechner], which had been introduced in evidence as Government Exhibits 112 and 113, were the amounts which had been disclosed in his income tax returns; whereas, in fact, they did not constitute a complete record of receipts from his professional practice, inasmuch as some 138 witnesses had testified to having paid the doctor amounts ranging from $25 to $500, of which there was no record anywhere in the doctor's books.

Dr. Gariepy testified that he had not prepared the insurance books and had never seen them; and that he had no knowledge of them. Miss Loechner testified that she had made up what she called the "insurance memorandum books" after she had given to Rex Beasaw the figures for the doctor's income tax. She said, moreover, that the so-called insurance books were not kept in the ordinary course of the doctor's business and had nothing to do with it. She furnished the accountants with figures derived from the yellow account sheets and from the black books. Asked why she made up these insurance memorandum books, she answered, "Well, the only thing I can recall right now, it was just possibly a way of keeping track of some of the companies that either we, the office, or the patients may have had some dealings with, or insurance papers that were filled out." She said it could be possible that there were some entries in the insurance books of payments made by the insurance companies direct to the patients, who later paid the money to the doctor.

Government Agent Philpott had not personally examined the insurance company records and had not previously testified concerning them when he was questioned by appellant's attorney regarding the results of the government's investigation as to payments made by insurance companies to appellant during the years 1945 and 1946. The best evidence of this would have been the records of the insurance companies. The attorney for the government urged that it was incumbent upon defendants to have brought in the insurance companies "as part of the defense of this case." Defendant's attorneys asserted that they had been taken by surprise. The trial judge disagreed with them.

As far as the record shows, appellant failed, after the incident, to call as witnesses the government agents *who had made the investigations at the offices of the insurance companies;* but introduced certain insurance company officials with the result that some of the payments were disclosed, but many records, according to the officials, had been destroyed after three years, or were at the home offices and not available for the trial, or such records had not been kept in complete form.

■ It would seem that the trial court acted within the limits of its discretion in denying appellant the right to cross-examine Philpott concerning records which he, himself, had not made;

and, moreover, appellant, in preparation of his defense, should not have relied upon eliciting by cross-examination facts which he deemed important to be proved but should have made timely preparation to present his affirmative proof. Cross-examination is, of course, of highest importance in an effort to elicit truth, but its limitation in the circumstances of each case rests largely within the sound discretion of the trial court. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Banning v. United States, 6 Cir., 130 F.2d 330, 337, certiorari denied 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556. See also Bell v. United States, 4 Cir., 185 F.2d 302, 310, 311; United States v. Hornstein, 7 Cir., 176 F.2d 217, 220; Chevillard v. United States, 9 Cir., 155 F.2d 929; United States v. Stoehr, 3 Cir., 196 F.2d 276, 280, 33 A.L.R.2d 836, certiorari denied 344 U.S. 826, 73 S.Ct. 28, 97 L.Ed. 643.

■ Appellant insists that the trial court committed reversible error in saying to the United States Attorney in the presence and hearing of the jury: "I think your case can be made without calling all those witnesses." At the time of the judge's comment, the government had introduced some seventy former patients of Dr. Gariepy who had testified that they had made payments to him for professional services. The judge stated that it would be a waste of both his and the jury's time to call very many more witnesses testifying along the same line and that he would place a limitation upon such testimony. In the context, the judge's remark would not tend to create the impression upon the jury that he considered the proof already adduced sufficient to establish the guilt of the accused. Defendant's attorney made so much ado about it, however, that the judge, later on in the trial, thus addressed the jury: "Ladies and Gentlemen of the Jury, counsel seem to have thought that the court had made a mistake by indicating that I didn't think that maybe it was necessary to call all the witnesses of this type. That is true, and I may find it necessary to place a limitation on this type of witness. I want you to remember that in what I said *I did not express any opinion on the merits of this case or the guilt or innocence of the defendant.* That is a question we will leave for you." [Italics supplied.] In our judgment, this explanation was adequate to relieve any possible adverse impression which might have been conveyed to the jury by the court's admonition to the district attorney. The criticism of the trial judge would seem to be captious. As was observed in Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680, magnification on appeal of instances of little importance in their trial setting should be guarded against. The trial judge stated that a parade of government witnesses that was in the offing could have been "quite prejudicial to the defendant" and that in limiting the number of witnesses he had actually acted in the interest of the defendant. We think he acted discreetly.

No parallelism whatever with the present case is found in the circumstances disclosed in Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841, cited by appellant.

Finally, appellant charges that the attitude of the trial judge toward appellant's attorneys manifested extreme impatience and almost hostility, as contrasted with his solicitude and consideration for government counsel; and that his conduct of the trial, when considered as a whole, constituted denial to appellant of his right to a fair and impartial trial. Appellant has cited and we have given due consideration to the following authorities: United States v. Minuse, 2 Cir., 114 F.2d 36, 39; Egan v. United States, 52 App.D.C. 384, 287 F. 958, 971; Frantz v. United States, 6 Cir., 62 F.2d 737, 739; Braswell v. United States, 5 Cir., 200 F.2d 597, 602; Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919; Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350; Sunderland v. United States, 8 Cir., 19 F.2d 202, 216; Wheeler v. Wallace, 53 Mich. 355, 358, 19 N.W. 33 (opinion by Mr. Justice Cooley).

[18] While in the instant case the distinguished trial judge was at times quite tart toward appellant's counsel in his rulings and comments, we are not convinced that he transcended the bounds of propriety or exhibited an attitude of such hostility toward these able and courteous attorneys as to cause a verdict to be rendered against appellant which otherwise would not have been found by the jury. The evidence of appellant's guilt of the crimes charged was adequately substantial.

There being no reversible error disclosed by the record of proceedings and trial in the district court, its judgment of conviction and sentence is affirmed.