Joseph ALLEN, Petitioner–Appellant,

v.

John W. HAWLEY, Respondent–
Appellee.

No. 01–1320.

United States Court of Appeals,
Sixth Circuit.

Aug. 7, 2003.

Before RYAN, CLAY, and GIBBONS,
Circuit Judges.

RYAN, Circuit Judge.

This appeal presents the question whether the district court erred in holding that the petitioner is not entitled to federal *habeas corpus* relief from his state court conviction for murder, on the ground that the alleged misconduct of the state trial judge denied him the fair trial that is guaranteed by the Due Process Clause of the Fourteenth Amendment.

We hold that the district court did not err.

### I.

Petitioner Joseph Allen was convicted of murder in the first degree in a Michigan state court and his conviction was affirmed on direct appeal to the Michigan Court of Appeals. *Michigan v. Allen,* No. 137526 (Mich. Ct.App. June 1, 1994) (unpublished disposition). His application for leave to appeal to the Michigan Supreme Court was denied. *Michigan v. Allen,* 448 Mich. 905, 532 N.W.2d 534 (Mich.1995) (order). He then brought a petition in the district court for federal *habeas corpus* relief and that, too, was denied. *Allen v. Hawley,* No. 97–40118 (E.D.Mich. Dec. 22, 2000) (unpublished order). He now appeals.

Allen's principal claim in the Michigan Court of Appeals and in his federal *habeas* petition is that he was denied a fair trial under the Due Process Clause of the Fourteenth Amendment because, during the course of his trial, the state trial judge's behavior repeatedly indicated a bias against the petitioner and in favor of the prosecution.

Our very limited authority to review the Court of Appeals decision is defined by Congress in 28 U.S.C. § 2254(d), a portion of the statute more popularly known as the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), codified as amended at 28 U.S. § 2254 (West Supp.2002). In § 2254(d), Congress enacted a rebuttable presumption that a federal court may not grant *habeas* relief from a state court conviction if the last state court adjudicated "on the merits" the same federal law question that is presented to the federal court. But Congress also created two exceptions to that bar. A federal court may grant *habeas* relief in such a case if the state court adjudication is either "contrary to" or "involved an unreasonable application of" settled federal law, as decided by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

The statute states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was [ (a) ] contrary to, or [ (b) ] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

28 U.S.C. § 2254(d) (West Supp.2002).

The parties seem to agree–at least they do not disagree–that when the Michigan Court of Appeals affirmed Allen's murder conviction, it rendered a decision "on the merits" of his claim that the state trial judge's alleged bias denied him a fair trial under the Due Process Clause of the Fourteenth Amendment. There also appears to be no disagreement that Allen made the same claim in his federal *habeas* petition. We agree.

Since it is not disputed that the state court ruling was "on the merits," we must declare "deference to the state court." *McKenzie v. Smith,* 326 F.3d 721, 726–27

(6th Cir.2003). We may *not* " 'exercise our independent judgment' and review the claim *de novo.*" *Id.* (quoting *Hain v. Gibson,* 287 F.3d 1224, 1229 (10th Cir.2002), *cert. denied,* 537 U.S. 1173, 123 S.Ct. 993, 154 L.Ed.2d 916 (2003)). Instead, our authority to entertain Allen's fair trial challenge is limited to determining only whether the Michigan Court of Appeals decision was (1) "contrary to" or (2) "an unreasonable application of" clearly established federal law, as determined by the United States Supreme Court.

In doing so, we first must determine whether the "contrary to" or the "unreasonable application of" prong of § 2254(d)(1) applies. The petitioner seems unconcerned about that distinction and in his brief to this court repeatedly argues that both prongs are applicable. The government is not much more helpful, arguing that the Michigan Court of Appeals decision was not "contrary to" or did not involve "an unreasonable application of" clearly established Supreme Court law, without discussing the distinction between the two. However, because the parties seem to agree that the state court decision implicated the right to a fair trial under the Due Process Clause of the Fourteenth Amendment, and thus was an "adjudicat[ion] on the merits," we will apply the "unreasonable application" prong rather than the "contrary to" prong of § 2254(d)(1). *See Bugh v. Mitchell,* 329 F.3d 496, 507–08 (6th Cir.2003); *Thompson v. Bell,* 315 F.3d 566, 585–86 (6th Cir.2003). The Supreme Court has defined an unreasonable application as " 'correctly identify[ing] the governing legal principle only to unreasonably apply that principle to the particular facts of the case at hand.' " *Thompson,* 315 F.3d at 586 (quoting *Doan v. Brigano,* 237 F.3d 722, 730 (6th Cir.2001)).

## II.

■ We now turn to the ultimate and dispositive question before us: whether the district court erred in concluding that the petitioner has not shown that the Michigan Court of Appeals "unreasonabl[y] appli[ed]" clearly established fair trial and due process law as decided by the United States Supreme Court when it concluded, on direct appeal, that he was not denied a fair trial by the alleged judicial bias of the state trial judge.

## III.

The specifics of the state trial judge's concededly rude, injudicious, and overbearing behavior during Allen's trial are amply detailed in the magistrate judge's report and recommendation and are set forth in even greater detail in our brother Judge Clay's opinion. Moreover, they are well known to the parties and need no reiteration in this unpublished opinion.

Allen argues in his brief to this court that what he variously describes as the trial judge's "hostility," "impatience," "intemperance," "unwonted intrusions," and "belligerent and argumentative" behavior amounted to judicial misconduct that in its total effect "broadcast partiality" in favor of the prosecution and against the petitioner, and therefore, denied Allen a fair trial. Although the petitioner does not explicitly declare that the "judicial misconduct" of the trial judge amounted to judicial "bias," we think that is the essence of his due process claim.

## IV.

Supreme Court decisions addressing claims of a denial of due process because of a trial judge's bias follow two lines of reasoning. One group of cases addresses charges of "judicial bias" stemming from a trial judge's "personal interest," or

"stake," in the outcome of a case, usually derived from some extrajudicial association with the cause or with one of the parties. *See In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927). The second group of cases is more appropriately described as the "judicial misconduct" cases. *See Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see also Alley v. Bell,* 307 F.3d 380, 386 (6th Cir.2002), *petition for cert. filed,* (U.S. May 19, 2003) (No. 02–10839). This second group consists, for the most part, of cases in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case, or for other reasons, thinks the prosecution should prevail. This, in essence, is Allen's claim.

The two groups of judicial bias cases do not trace parallel lines and they may converge. Experienced litigators are well aware that in criminal trials particularly, it is entirely possible that a trial judge who has no personal interest in the case or relationship with any of the parties or their counsel will nevertheless conduct the trial in a manner such that his interruptions, tone of voice, facial expressions, criticism of counsel, or comments on the evidence strongly suggest to the jury that the prosecution should prevail. In such cases, strictly speaking, it is the trial judge's "judicial misconduct" as distinguished from an antecedent "personal interest" which may result in impermissible judicial bias. *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. Indeed, the Supreme Court recognized as much in *Liteky,* when the majority observed that judicial bias includes "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* Such bias, in turn, can deprive the defendant of a fair trial because "[f]airness of

course requires an absence of actual bias in the trial of cases." *Murchison,* 349 U.S. at 136, 75 S.Ct. 623.

The type of bias defined in *Liteky* is precisely what the petitioner charges was present in his case. The petitioner claims that the trial judge was hostile, rude, overbearing, intemperate, and discourteous, and furthermore, that the trial judge repeatedly interrupted defense counsel's efforts to conduct cross examination and criticized defense counsel explicitly and implicitly for "just taking up [the court's] time" and presenting a "shotgun theory." Essentially, Allen claims that the trial judge's behavior toward defense counsel, combined with an absence of any such interruption or criticism of the prosecution, suggested "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

We do not hesitate to say that if we were a Michigan appellate court conducting direct review in this case, we might very well conclude that the trial judge's injudicious behavior, as detailed in the record of the trial, very likely conveyed to the jurors the appearance of such "favoritism or antagonism" toward the petitioner as to have made "fair judgment impossible." And if we were conducting direct review, we might have added this case to the ever-lengthening list of decisions in which Michigan appellate courts have found it necessary to reverse criminal convictions because of this same trial judge's intemperate and injudicious behavior. *See, e.g., Michigan v. Conyers,* 194 Mich.App. 395, 487 N.W.2d 787 (Mich.Ct.App.1992); *Michigan v. Ross,* 181 Mich.App. 89, 449 N.W.2d 107 (Mich.Ct.App.1989); *Michigan v. Moore,* 161 Mich.App. 615, 411 N.W.2d 797 (Mich.Ct.App.1987); *Michigan v. Sterling,* 154 Mich.App. 223, 397 N.W.2d 182 (Mich.Ct.App.1986).

But we are not conducting direct review and we have no superintending control over this trial judge. Moreover, we do not, under 28 U.S.C. § 2254(d), have the authority to grant a writ of *habeas corpus*, "[e]ven if we were to disagree" with the state court's conclusion that the trial judge's behavior, as offensive as it was, did not deprive Allen of the constitutionally required fair trial. *Campbell v. Coyle*, 260 F.3d 531, 543 (6th Cir.2001), *cert. denied*, 535 U.S. 975, 122 S.Ct. 1448, 152 L.Ed.2d 390 (2002). Nor would we have the authority to grant the writ if we were to determine, in our own independent judgment, that the Michigan Court of Appeals " 'applied clearly established federal law erroneously or incorrectly.' " *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir.2002) (citation omitted).

Ours, as we have said, is a far more narrow authority. It is to determine not whether the state court's conclusion is one we would reach, but whether it is a conclusion based on "an *objectively* unreasonable application of" settled Supreme Court due process law. *Thompson*, 315 F.3d at 585 (emphasis added). That means, of course, *not* that the Michigan Court of Appeals ought to have applied familiar due process principles differently than it did, but rather that it applied the principles in a fashion which was "unreasonable," that is to say, inordinate, illogical, and ultimately, irrational.

In his dissenting opinion, my brother offers the novel observation that we are "wrong" to state that we think "unreasonable," as used in § 2254(d)(1), means "inordinate, illogical, and ultimately, irrational," because (1) we do not offer any citation to an authority, and (2) "[i]f the [Supreme] Court wished to define 'unreasonable application' in terms like 'irrational,' it could have done so." Diss. op. at 7. To this startling observation, we deem it sufficient

to respond that we think it is obvious that a federal court's statement as to its understanding of the English language meaning of the word "unreasonable," does not depend for its correctness upon (1) the same meaning having first been declared by some other court, or (2) approved by the Supreme Court.

But if it brings comfort to learn that we are not alone in our view that in the English language, the term "unreasonable application" in § 2254(d)(1) means, *inter alia*, an application that is inordinate, illogical, and ultimately, irrational, we offer the following:

A. *unreasonable:* 1. Not guided by reason; irrational or capricious. [Black's Law Dictionary 1537 (7th ed.1999).]

B. *unreasonable:* 2 a: not governed by or acting according to reason: evincing indifference to reality or appropriate conduct: ill regulated in behavior b: not conformable to reason: ABSURD, INAPPROPRIATE, INCONGRUOUS ... 3: exceeding the bounds of reason or moderation: INORDINATE, UNCONSCIONABLE. [Webster's Third New International Dictionary of the English Language Unabridged 2507 (1986).]

C. *unreasonable:* 1. not endowed with reason; irrational. 2. Not acting in accordance with reason or good sense; not reasonable in conduct, demands, expectations, etc. 3. Not in accordance with reason; not based upon sound reason or good sense. b. Inequitable, unfair; unjustifiable. 4. Going beyond what is reasonable or equitable; excessive in amount or degree. b. Excessively, extremely. [Oxford English Dictionary Online (2d ed.1989).]

With these definitions in mind, we cannot say that the Michigan Court of Ap-

peals unreasonably applied federal law, and furthermore, the petitioner and his counsel have not demonstrated that it did so. We do not mean to criticize the defense counsel's work or his presentation to this court. The fact is, there is simply nothing in the Michigan Court of Appeals opinion–particularly its abbreviated and conclusionary statement that the trial court's alleged judicial bias did not deny Allen a fair trial–which at all indicates an unreasonable application of federal law. The dissent, in its unease at the absence of authoritative citations, seems concerned that the state court "neglect[ed] to cite a single relevant Supreme Court opinion," diss. op. at 9, but the Supreme Court itself has recently reminded us that it "does not require a citation of [its] cases–indeed, [the Court] does not even require *awareness* of [its] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them," *Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original). We find no basis to conclude that the Michigan Court of Appeals applied the familiar constitutional fair trial and due process principles "unreasonabl[y]," as § 2254(d)(1) requires be shown, rather than just differently than another appellate court, including this one, might have applied them.

## V.

■ The petitioner also claims that he was denied the right to present a defense when the trial court excluded the proposed testimony of defense witness Jay Schaefer who would have testified to a jailhouse statement against penal interest made by Sean Feijoo, a friend of Allen's, who stated that he (Sean Feijoo) had killed the deceased for whose murder Allen was ultimately convicted. Applying Michigan Rule of Evidence 804(b)(3), which permits the admission of a hearsay statement against penal interest only if "corroborat-

ing circumstances clearly indicate the trustworthiness of the statement," the trial court excluded Schaefer's testimony concerning Sean Feijoo's statement because it lacked the requisite trustworthiness.

Again, as in the due process issue discussed above, the question before us is whether the district court erred in concluding that the Michigan Court of Appeals did not unreasonably apply established federal law when it concluded that the proffered statement was properly excluded because it did not bear the requisite indicia of trustworthiness.

The applicable federal law was announced in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), wherein the Supreme Court acknowledged that the constitutional right to present a defense "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 295., 93 S.Ct. 1038 The "other legitimate interest[ ]" in *Chambers,* as in this case, was the state's interest in requiring that statements against penal interest which are admitted as an exception to the hearsay rule were made under circumstances that clearly indicate the trustworthiness of the statement.

It is indisputably clear that when deciding this issue, the Michigan Court of Appeals recognized that it was considering a federal constitutional challenge and that the principal controlling federal law was announced in *Chambers.* The Michigan Court of Appeals wrote:

> For his next issue, defendant claims that he was denied the right to present a defense when the judge excluded hearsay testimony that someone else had confessed to the crime....
>
> ... When a constitutional violation is claimed, the following factors are also relevant: (1) the time when the declara-

tion was made–how soon after the crime; (2) to whom it was made–whether it was made to someone to whom the declarant would likely speak the truth; (3) the existence of independent corroborating evidence; and (4) the availability of the declarant as a witness. [*Chambers*, 410 U.S. at 300–01, 93 S.Ct. 1038.] In this case, there were no indicia of reliability. The statement was made about two years after the crime; it contained no facts which could not have been gathered from a newspaper; there was no indication that the declarant and the proposed witness were anything except cellmates [sic]; the declarant refused to testify; and there was no corroborating evidence offered. We therefore conclude that the trial court did not abuse its discretion nor den[y] defendant the right to present a defense by excluding this testimony.

*Allen*, No. 137526, at 1–2 (footnote omitted).

Whether this court would or would not have come to the same conclusion reached by the Michigan Court of Appeals as to the trustworthiness of the proffered statement is completely irrelevant. The question is whether when the Michigan Court of Appeals adjudicated the federal question it unreasonably applied *Chambers* and the Due Process Clause of the Fourteenth Amendment. Clearly it did not. The state court followed *Chambers* and carefully considered the circumstances surrounding the statement, such as the time at which the statement was made, the relationship between the declarant and the proposed witness, and the existence of independent corroborating evidence. Based on the state court's detailed analysis of the facts, its conclusion that the statement was untrustworthy was not an unreasonable application of United States Supreme Court precedent.

## VI.

We have carefully considered each of the petitioner's four additional assignments of error concerning the trial court's comments on the evidence, interference with defense counsel, and evidentiary rulings, all of which fall generally under the right to a fair trial. We think these issues derive from the petitioner's judicial bias claim because he characterizes the comments and rulings as unduly adverse to his cause. In light of our conclusion that the Michigan Court of Appeals did not unreasonably apply due process principles in evaluating the more specific instances of alleged judicial bias, we likewise conclude that the remaining claims are without merit and warrant no explication.

## VII.

We conclude that the district court did not err when it held that the petitioner has not demonstrated that the Michigan Court of Appeals, in deciding his right to a fair trial and right to present a defense claims, rendered a decision that involved an unreasonable application of clearly established due process principles.

For these reasons, the judgment of the district court is AFFIRMED.

CLAY, Circuit Judge, dissenting.

Petitioner's trial involved numerous instances of judicial misconduct that the majority minimizes or simply ignores. The state trial court's blatant pro-prosecution bias warrants habeas relief, as does the state trial court's refusal to admit a corroborated hearsay statement that most likely would have altered the trial's outcome. Furthermore, the Michigan Court of Appeals applied a constitutional standard "contrary to" established federal law

as determined by the Supreme Court. I therefore respectfully dissent.

To properly understand the manner in which the state trial judge reduced Petitioner's trial to a shambles bearing little resemblance to an actual trial proceeding, it is necessary to thoroughly understand the facts. Since the majority fails to review the facts, I will do so here.

## FACTS

Petitioner allegedly murdered his eighteen year old girlfriend, Judy Betzing, on July 18, 1988. No one disputes several important facts about Betzing's background: she worked as a prostitute, she used crack cocaine, and she had an argumentative relationship with Petitioner punctuated by occasional violent incidents.

Police discovered Betzing's body in the water of a Monroe County, Michigan quarry on the evening of July 19, 1988. The medical examiner confirmed that Betzing suffered a knife wound, although gunshots caused her death. The autopsy verified that she died sometime in the early evening of July 18, 1988. Petitioner's first trial ended in a mistrial.[1] He was then convicted of first-degree murder after a second jury trial in the former Recorder's Court for the City of Detroit, on October 8, 1990.

During the second trial, prosecution witness Jenny Daniels testified that she and her boyfriend were returning from the movies at about 11:30 p.m. on July 16, 1988, when an unknown woman later identified as Betzing ran up to her. Betzing had bruises on her limbs and smelled of alcohol. She wore a tank top and was barefoot. Daniels further testified that Betzing told her that her boyfriend (Petitioner) would kill her if she went to the police. Finally, Daniels claimed that Betz-

ing told her that Dale Allen, Petitioner's brother, "killed a girl on Belle Isle and paid a judge to let him off." (J.A. at 335.)

Daniels took Betzing to a local police station where she was interviewed by Officer Maria Cox. Cox confirmed that Betzing was bruised, crying and intoxicated.

Betzing's ex-boyfriend, Robert Ferguson, testified that he picked up Betzing from the police station on July 16, 1988. Betzing remained with Ferguson over the weekend before returning to work on July 18, 1988. Ferguson explained that when Betzing came home from work, she wanted to see Armando Feijoo, an acquaintance of both Petitioner and Betzing. Ferguson dropped Betzing off in the Springwells area of Detroit. Betzing and Ferguson saw Armando Feijoo on a bicycle just before they stopped, but he disappeared. Betzing said she would "get him later on his beeper." (J.A. at 427.)

Petitioner's neighbor, David Barrios, testified that he often saw Petitioner and Betzing argue, but never any violence. Barrios also claimed that once, he saw Petitioner with a knife. Barrios also testified that he observed a fight between Sandra Moore and Betzing in July of 1988, at which time Moore had a knife.

Betzing's brother, Robert Betzing, testified that he met Petitioner once or twice and saw him with a handgun about a year before Betzing's murder. After cross-examination, the court allowed Robert Betzing to discuss his testimony in the hallway with the prosecutor. He was then permitted to retake the stand and claimed to have heard Petitioner tell Ms. Betzing, "if you ever go the police and squeal on me, I'll kill you." Mr. Betzing could not recall how the subject came up, nor could he

---

1. Defendant's first trial (ending in a mistrial) was held before a different judge.

explain why the police left the remark out of their report.

Chester Beliles explained that he spent several weeks in the county jail with Petitioner. Beliles admitted writing a letter regarding a conversation with Petitioner in which Petitioner confessed. On the stand, however, Beliles expressed reluctance to testify, said Petitioner was being "railroaded," and could not recall to whom he wrote the letter. Finally, Beliles admitted that before he wrote the letter, a police detective gave him the details of Petitioner's case and suggested to Beliles that his assistance might help him at his sentencing.

Another cellmate of Petitioner, Bobby Guy, also testified that Petitioner made incriminating statements. On the stand, Guy initially said that whatever he told the police was a lie. The court allowed the prosecutor to play a tape to refresh Guy's recollection. On the tape, Guy recounted to police how Petitioner confessed to Betzing's murder. After insisting again that he lied during the recorded interview, Guy then told the jury that everything on the tape was true. Guy also claimed that nine or ten other prisoners were present in the cell when Petitioner allegedly admitted to the crime, but no one else heard him.

Defense counsel later produced a letter from Guy in which Guy admitted to having lied on the stand. He then again changed his testimony and claimed to have truthfully testified about Petitioner's confession. Guy's letter was not presented to the jury.

Sandra Moore testified at the first trial, but could not be located for the second. The court found her unavailable and allowed the prosecution to introduce her prior testimony. Moore claimed to have seen fighting between Petitioner and Betzing on July 17, 1988. Moore next saw Petitioner on July 20, when Petitioner told her Betzing was dead. Moore later went to Petitioner's home, and Petitioner asked her to help clean. According to Moore, Petitioner had slit his wrists. She described blood all over the kitchen, although serological tests confirmed that the blood did not match Betzing's.

Sergeant Charles Chapman of the Michigan State Police pulled Betzing's body from the water on July 19, 1988. Chapman later took Petitioner into custody on July 27, 1988 and interviewed him about Betzing's death. Petitioner denied involvement.

Michigan State Police scientist Harry Reed testified about his examination of a truck belonging to Steve Romatowksi, a man who arrived at the quarry shortly after the body was discovered and who the police initially suspected of being involved in the crime.

Armando Feijoo testified that Petitioner arrived at his house the day before the murder. After explaining that Betzing had stolen cocaine from him, Petitioner asked for a gun and a car. Petitioner claimed that if he found her he would kill her with a knife. With respect to Betzing, however, Armando Feijoo originally told police that he had not seen her after July 14. In his first five statements to the police made on the day the body was found and in interviews on August 4, August 8, August 10, 1988, and later in January, 1989, Armando Feijoo did not inculpate Petitioner. When police informed Armando Feijoo that they had a witness who saw him with Betzing on July 18, Armando Feijoo recounted the set of events to which he ultimately testified. He claimed to have changed his story because police threatened him.

In a written statement, Armando Feijoo told authorities that Betzing arrived at his house on July 18, between 5:30 and 6:30 p.m. There, Betzing smoked crack with Armando Feijoo and his sister, Luz Feijoo.

Betzing told Armando Feijoo not to "tell [Petitioner] I was here." (J.A. at 350–51.) After smoking the crack, Betzing allegedly asked Luz Feijoo to walk her to a car in the parking lot of a nearby laundromat, where Betzing would meet a "customer." (J.A. at 154.) Luz Feijoo told Betzing that she would watch her walk to the car from the backyard of Armando Feijoo's home. As Betzing walked to the laundromat, a green station wagon pulled up next to her. According to Luz Feijoo, Petitioner and another man exited the vehicle and grabbed Betzing. Petitioner shot her twice in the face and the other man slit her throat. Over objection, Armando Feijoo told the jury that he passed a polygraph examination when telling police this story. Armando Feijoo also said he initially lied because of threats from Petitioner's brother, Gary Allen. Armando Feijoo received immunity in exchange for his testimony.

Luz Feijoo originally testified for the defense at a preliminary hearing and denied any knowledge of the shooting. Later, while being held by the police on unrelated charges, she changed her story and claimed to have seen Petitioner kill Betzing. Petitioner purportedly spoke to Luz Feijoo about his problems with Betzing a week before the murder and told Luz Feijoo that he would kill Betzing for stealing drugs.

At trial, Luz Feijoo gave testimony similar to Armando Feijoo's. She added that on the day of the murder, Betzing wore jeans, a pink T-shirt, and shoes, which were not the clothes later found on her body. Luz Feijoo also claimed to have seen the murder from a shed in the backyard, although the shed has no windows. When Luz Feijoo initially told Armando Feijoo about the killing, she claimed to have seen it from her second-story bedroom window.

Petitioner offered one important witness of his own, prisoner Jay Schaefer. Schaefer shared a cell with Sean Feijoo, Armando Feijoo's nephew. Schaefer would have told the jury that Sean admitted that he and Armando Feijoo killed Betzing, but the court excluded the testimony.

Despite the prosecution's less than compelling case, Petitioner was convicted and received a sentence of life without possibility of parole on October 23, 1990. Petitioner appealed to the Michigan Court of Appeals, which affirmed in an unpublished *per curiam* opinion issued June 1, 1994. *People v. Allen*, No. 89–007509, slip op. (Mich. Ct.App. Jun. 1 1994) (per curiam). The Michigan Supreme Court denied leave to appeal, with two judges dissenting. *See People v. Allen*, 448 Mich. 905, 532 N.W.2d 534 (Mich.1995).

Petitioner requested habeas relief on April 23, 1997. After the district court denied his petition, Petitioner filed this timely appeal.

## DISCUSSION

Petitioner's habeas petition raises six claims, two of which resurrect lingering uncertainty about his guilt. I agree with the majority that habeas petitions are governed by the Antiterrrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. §§ 2254 (Supp.2002) ("AEDPA")). AEDPA's objective is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1849, 152 L.Ed.2d 914 (2002). The statute provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

I disagree, however, with the majority's definition of "objectively unreasonable." Without citation, the majority asserts that the phrase "objectively unreasonable" means *"not* that the Michigan Court of Appeals ought to have applied familiar due process principles differently than it did, but rather that it applied the principles in a fashion which was 'unreasonable,' *that is to say, inordinate, illogical, and ultimately, irrational."* (emphasis of "not" in original, other emphasis added). The majority is wrong to claim that "objectively unreasonable" means "inordinate, illogical, or irrational." According to the Supreme Court, "unreasonable application" includes situations in which "the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495. If the Court wished to define "unreasonable application" in terms like "irrational," it could have done so.

Presumably, if a state court decision is incoherent enough to qualify as "illogical" or "irrational," then "all reasonable jurists" would agree that the state court reached an incorrect conclusion. Yet *Williams* explicitly rejected the view, adopted by the Fourth Circuit, that an "unreasonable application of" clearly established federal law requires that the application be one that all reasonable jurists would agree was unreasonable. *See Williams,* 529 U.S. at 409-10, 120 S.Ct. 1495.

The majority cites three dictionaries, but not *Williams* or other case authority, to support its conclusion that, *in the context of habeas jurisprudence,* "unreasonable" can mean irrational, despite the Supreme Court's express instruction that "unreasonable" includes mistakes not so serious that "all reasonable jurists" would find error. *See id.* Yet by definition, a reasonable jurist does not accept an irrational conclusion.

Legal scholars have long recognized that "reasonable" is hard concept to define: "unreasonable application" in habeas, the mysterious "reasonable man" in torts, "reasonable reliance" in contract, and so forth. "Reasonable" and its opposite, "unreasonable," have lots of definitions, but the definition applicable for our purposes is the one provided by *Williams.* The three dictionaries the majority cites provide a litany of others. According to the majority's dictionaries, "irrational" is a possible meaning of "unreasonable," but the dictionaries also include such possible meanings as "inequitable" and "unfair." One wonders why the majority, without any guidance from Congress–and with *Williams* suggesting otherwise–chose to use the word "irrational." This may reflect the weakness of the majority's position; concerned that they cannot convince readers that the Michigan Court of Appeals was merely unfair, inordinate, or illogical, the majority needs to use "irrational" as its standard.

Perhaps the majority is intent upon making habeas appeals so difficult that unless the state courts spout incoherent

babble, petitioners lose–even a Petitioner serving a life sentence who clearly received an unfair trial and may be factually innocent. As the Second Circuit recently wrote, "[f]or an application to be 'objectively unreasonable,' '[s]ome increment of incorrectness beyond error is required'.... [T]he increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Fuller v. Gorczyk*, 273 F.3d 212, 219 (2d Cir.2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)). This Court need not find judicial incompetence to grant a habeas petition.

## I.

Petitioner cites twenty-two instances of improper judicial statements during his trial. He claims that the Michigan courts erred by failing to reverse his conviction on the basis of these remarks. The majority notably fails to include the Michigan Court of Appeals' discussion of this issue. The state court wrote:

> Defendant first argues that he was denied a fair trial by the trial judge's improper remarks made in front of the jury. We disagree.
>
> We first note that the Defendant failed to object to most of these allegedly improper remarks. However, there is a conflict in this Court regarding whether objections to this kind of conduct are necessary. *See People v. Moore*, 161 Mich.App. 615, 619,620, 411 N.W.2d 797 (1987). Without resolving this conflict, we find that, read in the context of the entire proceeding, the comments did not deprive defendant of a fair trial. *People v. Conyers*, 194 Mich.App. 395, 404, 487 N.W.2d 787 (1992); *People v. Ross*, 181 Mich.App. 89, 91, 449 N.W.2d 107 (1989).

*Allen*, No. 137526, at 1. This constitutes the Michigan Court of Appeals *entire* dis-

cussion of Petitioner's judicial bias claim. The Michigan Court of Appeals neglects to cite a single relevant Supreme Court opinion, let alone analyze the issue in more than a perfunctory manner.

Habeas relief is appropriate if a state court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if "it fails to apply the correct controlling authority," *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir.2002), or "where the state court 'applies a rule that contradicts the governing law set forth' in those precedents," *Brumley v. Wingard*, 269 F.3d 629, 638 (6th Cir.2001) (quoting *Williams*, 529 U.S. at 405, 120 S.Ct. 1495). The Michigan Court of Appeals applied law contrary to Supreme Court precedent when considering Petitioner's judicial bias claim.

As the above-quoted passage reveals, the Michigan Court of Appeals cited only two cases for its terse conclusion that "read in the context of the entire proceeding, the [judicial] comments did not deprive defendant of a fair trial." *Allen*, No. 137526, at 1. This holding is problematic because judicial bias creates a structural defect in a trial, making harmless error (prejudice) analysis inappropriate. *See Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (opinion of Rehnquist, C.J., for the Court) (listing as examples of errors that are not subject to harmless error analysis: total deprivation of the right to counsel at trial; *judicial bias;* unlawful exclusion of members of the defendant's race from a grand jury; deprivation of the right to self-representation at trial; and deprivation of the right to a public trial); *Rose v. Clark*, 478 U.S. 570 at 578–79, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) ("[I]f the defendant had counsel and was tried by an impartial

adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis.") (citation omitted); *Chapman v. California*, 386 U.S. 18, 24 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966) (stating that the right against coerced confession, the right to counsel and *the right to an impartial judge* were examples of constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error").

The two cases cited by the Michigan Court of Appeals both make the same mistake. *People v. Ross* applies this rule: "Although unfair criticism of defense counsel in front of the jury is always improper, reversal is necessary only where the court's conduct denied a fair and impartial trial *by unduly influencing the jury*." 181 Mich.App. 89, 449 N.W.2d 107, 108 (1989) (emphasis added). Yet, under *Fulminante*, 499 U.S. at 309, 111 S.Ct. 1246, *Rose*, 478 U.S. at 578–79, 106 S.Ct. 3101, and *Chapman*, 386 U.S. at 24 n. 8, 87 S.Ct. 824, it makes no difference whether improper remarks demonstrating bias actually influenced the jury. *See Bracy v. Schomig*, 286 F.3d 406, 414 (7th Cir.2002) ( "[T]here is no harmless error analysis relevant to the issue of judicial bias."); *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir.1999)

("[T]he harmless error doctrine is inapplicable in cases where judicial bias and/or hostility is found to have been exhibited at ·any stage of a judicial proceeding.") (quoting *Anderson v. Sheppard*, 856 F.2d 741, 746–47 (6th Cir.1988)); *Hennessy v. Goldsmith*, 929 F.2d 511, 515 (9th Cir.1991) ("[H]armless error analysis is inappropriate in certain discrete contexts, *e.g.*, denial of counsel and judicial bias.").

Likewise, in the only other decision cited, *People v. Conyers*, the Michigan Court of Appeals stresses that its "opinion will focus primarily on those instances [of judicial partiality] that have jeopardized the defendant's opportunity for a fair trial." 194 Mich.App. 395, 487 N.W.2d 787, 788 (1992). Again, under Supreme Court precedent, once judicial bias is shown, the inquiry ends. It makes no difference whether the defendant received a fair trial anyway. *Maurino v. Johnson*, 210 F.3d 638, 644 (6th Cir.2000) (explaining that judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal").

As these cases demonstrate, the Michigan Court of Appeals applied a rule in Petitioner's case that–contrary to Supreme Court precedent–required Petitioner to show more than just a biased judge, but that the judge's bias influenced the jury.[2]

---

2. The majority's response to the argument in Section I is bewildering. There are probably substantive responses one could make to my argument that the Michigan Court of Appeals applied law "contrary to" established Supreme Court precedent, but the majority never makes them. Instead, the majority writes:
    The fact is, there is simply nothing in the Michigan Court of Appeals opinion–particularly its abbreviated and conclusionary statement that the trial court's alleged judicial bias did not deny Allen a fair trial–which at all indicates an *unreasonable application* of federal law. The dissent, in its unease at the absence of authoritative citations, seems concerned that the state court

"neglect[ed] to cite a single relevant Supreme Court opinion," diss. op. at 9, but the Supreme Court itself has recently reminded us that it "does not require a citation of [its] cases–indeed, [the Court] does not even require *awareness* of [its] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them," *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original). We find no basis to conclude that the Michigan Court of Appeals applied the familiar constitutional fair trial and due process principles "unreasonabl[y]," as § 2254(d)(1) requires be shown, rather than just differently than an-

## II.

With respect to the merits of Petitioner's judicial bias claim, the first task is determine the proper scope of review. Respondent correctly notes that Petitioner directly addressed only four of these instances in the Michigan courts. Respondent argues that this Court lacks jurisdiction over the remaining eighteen examples of misconduct because they were not "fairly presented" to the Michigan judiciary. Federal courts reviewing habeas petitions do not have jurisdiction over claims not first fairly presented to state courts, and a claim is not "fairly presented" below where a habeas petition enlarges the factual basis for a claim. *Lott v. Coyle*, 261 F.3d 594, 618–19 (6th Cir.2001); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir.1998).

This Court, however, has an obligation to "consider the entire record" when analyzing comments that may reflect judicial misconduct. *Dixon v. Fed. Express Corp.*, 33 Fed.Appx. 157 (6th Cir.2002) (per curiam); *accord United States v. Polito*, 856 F.2d 414, 418 (1st Cir.1988); *United States v. Welch*, 745 F.2d 614, 621 (10th Cir.1984); *United States v. Billups*, 692 F.2d 320, 327 (4th Cir.1982); *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 334–35 (5th Cir. 1981). One cannot view the whole record without considering those instances of misconduct that Petitioner did not properly

preserve. Put differently, this Court must consider the context of each remark, and the larger "context" of the trial includes procedurally defaulted statements by the court. *Cf. Berger v. United States*, 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ("It is impossible without reading the testimony at some length, and thereby obtaining a knowledge of the setting in which the objectionable matter occurred, to appreciate fully the extent of the misconduct."). Thus, although this Court could reach a conclusion without relying upon those remarks not directly called to the attention of the Michigan Supreme Court, the other statements provide relevant background.[3]

An impartial judge is a necessary component of a fair trial. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927). The Supreme Court explained, "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Carter v. Kentucky*, 450 U.S. 288, 302, 101 S.Ct. 1112, 67 L.Ed.2d 241 n.20 (1981) (quoting *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894)). As this Court noted in another recent habeas appeal,

---

other appellate court, including this one, might have applied them.
(emphasis added). This paragraph deals with "unreasonable application," not the "contrary to" half of AEDPA. The concern I express in Section I about the Michigan Court of Appeals' one sentence dismissal of Petitioner's judicial bias claims is not that the analysis is overly concise, but that the Michigan Court of Appeals applied law "contrary to" established Supreme Court precedent, an error requiring habeas relief. *See* 28 U.S.C. § 2254(d)(1). To summarize the problem, *the Michigan Court of Appeals approached the judicial bias claim as one in which Petitioner had to dem-*

*onstrate that he received an unfair trial, when according to established Supreme Court precedent, once one establishes judicial bias, an unfair trial is presumed.*

3. It is also unnecessary to discuss one of the four properly preserved judicial remarks because it occurred outside the presence of the jury. *See United States v. Morrow*, 977 F.2d 222, 225 (6th Cir.1992) ("Much of the concern about an otherwise inappropriate judicial act or remark is neutralized by the absence of the jury.").

when considering judicial bias claims, this Court "looks to the Supreme Court's decision in *Liteky v. United States* to provide the standard." *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir.2002) (applying *Liteky* under AEDPA). In *Liteky*, the Court cautioned that a "judge's ordinary efforts at courtroom administration–even a stern and short tempered judge's ordinary efforts at courtroom administration–remain immune." *Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). "Expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display do not establish bias or partiality." *Id.* at 555–56, 114 S.Ct. 1147. Yet, as explained above, judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal." *Maurino v. Johnson*, 210 F.3d 638, 644 (6th Cir. 2000); *see also Chapman v. California*, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (stating that the right against coerced confession, the right to counsel and the right to an impartial judge were examples of constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error"). Thus, this Court does not review judicial bias for harmless error.

The first instance of properly preserved problematic judicial behavior occurred during the cross-examination of Lieutenant Reed. Reed and Detective Chapman testified about the inspection of two vehicles found near Betzing's body. One was registered to Joe Wiseman, and one to Stephen Romatowski. On cross-examination, defense counsel sought to develop several important points. The morning after police discovered the body, officers saw Romatowski driving near the quarry. When Romatowski noticed the police, he turned around to leave. Investigators found blood in Romatowski's vehicle (from Romatowski), along with Budweiser cans similar to several found near Betzing's body. He lived thirty-five miles away, and told the police he was in the area looking for deer, but had forgotten his camera. Police established that Romatowksi recently cleaned his vehicle. Police detained Romatowski as a suspect. During his interrogation, he told investigators that the quarry was a great place to dump a body.

The information about Romatowksi could support a credible alternative theory about the crime or at least raise reasonable doubt about Petitioner's guilt. In front of the jury, during the cross-examination of Lieutenant Reed designed to elicit information about Romatowski, the trial court interjected its own opinion on the Romatowski hypothesis. claiming that defense counsel was "just taking up time." (J.A. at 500.)

The second instance of troubling judicial conduct occurred during the cross-examination of Detective Chapman, and also before the jury. This time, the court went further by calling counsel's efforts to suggest Romatowksi's involvement a "shotgun theory." (J.A. at 319.) The court then asked counsel, "do you have anything pointing to this man [Romatowksi] as somebody that took this life?" (*Id.*) As this Court wrote in *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir.1979), "a trial judge's position before a jury is overpowering.... His position makes his slightest action of great weight with the jury." (internal quotations omitted.) Indications of outright bias ordinarily constitute reversible error. *Id.* at 933. "As the jurors are the triers of facts, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments." *Starr*, 153 U.S. at 625, 14 S.Ct. 919. Here, the court told the jury that the defense's effort to put

forth an alternative hypothesis was "just taking up time" and amounted to nothing more than a "shotgun theory." Through these two remarks, the trial judge unquestionably informed the jury that he disbelieved the defense. For the jury to accept that the Romatowski evidence raised reasonable doubt, the jury would have to reach a conclusion that jurors knew would conflict with the judge's perspective. That alone warrants habeas relief.

The third properly preserved incident of questionable judicial conduct occurred during Armando Feijoo's cross examination. Defense counsel sought to discredit Armando Feijoo by highlighting inconsistencies between his direct examination testimony and his preliminary examination testimony. Petitioner's lawyer asked Armando Feijoo whether he had previously lied and Armando Feijoo conceded that he had. Several times, the trial court told counsel to rephrase his questions. (*Id.*) Later, the court tried to limit this line of questioning, stating that the "question is not did [the witness] lie some other time. The question is is he lying today?" (J.A. at 164–65.) The court interrupted several times to emphasize this point:

> I don't want to hear about all of the testimony that he gave last time, sir. I don't want to hear anymore about it.... You ask him a question, sir, and see if he answers it. And then if he answers it differently than he answered some other way and you want to impeach him, go right ahead. Otherwise, I don't want to hear it and I direct you not to put any more questions to him in that manner. Because it's irrelevant.

(J.A. at 165.) After again admonishing counsel for asking questions in an "improper manner," the court told the jury:

> Let me tell you something. Ladies and gentlemen, forget about that oath. As far as that [preliminary examination tes-

timony] transcript is concerned, it's not under oath. As far as you are concerned, that transcript is no different than a statement.... It's not sworn testimony before you.... There is no difference as far as impeachment or refreshing of recollection is concerned between a transcript and a statement or any other writing, ladies and gentlemen as long as it's not sworn to here. So don't be impressed by the fact that [defense counsel] keeps saying it's sworn testimony.

(*Id.*) Petitioner argues that the court substantially hindered his effort to impeach Armando Feijoo by showing that he had already lied under oath. I agree. As this Court wrote, a judge must always remain "calmly judicial, dispassionate, and impartial." *Hickman*, 592 F.2d at 933 (internal quotation omitted). A judge should "sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury." *Id.* The trial transcript reveals that Judge Moore encouraged the jury to ignore the inconsistencies in Armando Feijoo's testimony. Judge Moore also ordered the jury not to consider Armando Feijoo's history of lying under oath. By making these statements, he attempted to influence (and probably did influence) how much credibility the jury awarded Armando Feijoo. Yet credibility judgments are the province of the jury, not the court. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). As the Supreme Court instructs, the ability of the trial judge to "comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses." *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). The trial judge's attempt to blunt the problems with Armando Feijoo's testimony demonstrated

his predisposition toward the prosecution, which warrants habeas relief.

Although the aforementioned judicial comments themselves raise serious doubts as to whether Petitioner received a trial before a fair tribunal, the judge's other comments during the proceeding make matters worse. Prosecutors wanted prisoner Chester Beliles to testify that he wrote a letter that included an incriminatory statement Petitioner made to him. On the stand, however, Beliles said he would not testify against Petitioner. The court denied Beliles' request for an attorney. The prosecutor moved to admit the letter containing Petitioner's alleged party admission. The court took the motion under advisement, but let the prosecutor treat the witness as hostile and ask leading questions–including reading from the letter. The court invited the prosecutor to "read the whole letter ... read it, sir." (J.A. at 186.)

The prosecutor read: "I have some information on [Petitioner]. He told me personally that he picked up his girlfriend, Judy, off some street. He said she was a prostitute." (*Id.*) When asked to acknowledge the statement's veracity, Beliles refused and said he would rather be held in contempt than testify. *Id.* at 36. At the court's urging, the prosecutor read further: "he said she was a prostitute and took her [sic] to a park or church. I am not sure if he was telling me that there was a church across from it or the car was parked by a church or what." (*Id.*)

Defense counsel objected because Beliles had already indicated he wanted an attorney and would risk contempt rather than testify. Overruling the objection, the court told the prosecutor to "lead him [Beliles]. Read everything." (*Id.*) When asked whether Petitioner told him he took Betzing to a "park or church," Beliles responded, "I'm not going to say nothing."

(*Id.*) The court ordered the prosecutor to "[g]o on with the rest of it." (*Id.*) The prosecutor read: "he told me that he shot her twice in the head and cut her throat." (*Id.*) The prosecutor asked, "[d]id you write that?" (*Id.*) The court interrupted, noting that Beliles already conceded that he wrote the letter. The court instructed the prosecutor to "[a]sk him, did [Petitioner] tell him that?" (*Id.*) The prosecutor obliged, but Beliles repeatedly refused to answer.

The prosecutor then asked, "[d]id you not write, I am not sure if he was just boasting but he did mention something about shooting her behind the ear or close to it or something like that?" The court interjected, "[d]id [Petitioner] tell you that?" (*Id.* at 137.) The prosecutor parroted the question: "[d]id he tell you that, sir?" (*Id.*) Beliles still refused to answer. (*Id.*) The prosecutor then asked,

> Did you write, I don't know why he would tell me all of this. The conversation started with me telling him about my ex-wife's drug and alcohol problem and how she used to be a prostitute when I met her and how I found out about her going out with other guys and how I beat her up pretty bad. Did you write that?

(*Id.*) Beliles answered affirmatively. When the prosecutor mistakenly asked if Beliles told Petitioner these things, the court interrupted to assist, "No. The other way around, Mr. Prosecutor." (*Id.*)

Later, the prosecutor asked Beliles, "[t]he last sentence in your letter–I also remember him saying he slapped Judy around for reasons similar [sic] before killing her and she was supposed to have reported it. Is that in your letter?" (J.A. at 189.) The court answered: "The only question we want to know is did [Petitioner] tell him that? He already adopted the whole writing as his. He said he wrote it.

He doesn't remember if he wrote it to one detective or another. He says, yes, this is what I wrote." (*Id.*) The prosecutor then asked, "[n]ow, sir, there are number of details contained in this letter. First of all, that his girlfriend's name is Judy. That occurs, does it not?" (*Id.* at 189–90.) The court again answered instead of the witness, "Sir, it's there. It's there." (*Id.* at 190.)

Any juror watching the direct examination of Beliles would understand that the court thought Petitioner was guilty. "Interference with the presentations of counsel potentially makes a mockery of a defendant's right to a fair trial, even in the absence of open hostility." *United States v. Slone,* 833 F.2d 595, 598 (6th Cir.1987). This is precisely what the court did–the trial judge hijacked portions of the examination, suggested questions, and sometimes provided answers. The Supreme Court has made very clear that "privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness." *Quercia,* 289 U.S. at 470, 53 S.Ct. 698.

The record is replete with other examples of judicial overreaching. The following exchange took place during the cross examination of Jenny Daniels:

> PROSECUTOR: Your Honor, if counsel is going to impeach her, I think he has to refer to something. I don't know what he is talking about.
>
> COURT: He's not talking about anything. He asked her if she remembered it. She said, no, apparently. If she said no, and there is nothing to suggest that she said it, then she never said it.

Remember, ladies and gentlemen, it's not what they said the witness said. He asked the question, assuming a fact to be true. Isn't it true you said a tank top? She said, no, I don't remember saying that. The only thing she said so far is a tube top. So even though he said it in that manner, remember, that doesn't make it true.

He asked her whether she did that and she said, no, I don't remember saying that. Then he went to asking and describing the color of the garment that this lady says, the woman, Judy, she picked up, had on. He said, do you remember saying it was white?

You agree you did say it was white? Is that right? Is that what you said? Ma'am, do you remember telling the police it was a white top?

> WITNESS: I can't remember.
>
> COURT: You don't remember if you told that to the police either?
>
> WITNESS: I just remember the tube top on her.

(J.A. at 336–37.) The court takes over the cross examination of Daniels. Equally important, the court belittled Petitioner's counsel by saying, "[h]e's not talking about anything." (J.A. at 336.)

The following exchange occurred when defense counsel questioned Robert Ferguson:

> DEFENSE COUNSEL: When you made the statements to the police, you didn't make any statements in here or in your statement at Monroe that Judy wanted a quarter to call the [Petitioner's] family, did you?
>
> WITNESS: Did I say that?
>
> DEFENSE COUNSEL: At that time?
>
> WITNESS: You are asking me, did I say that?

DEFENSE COUNSEL: Do you recall the day?

WITNESS: Yes. She wanted to call.

DEFENSE COUNSEL: Do you recall making the statement to the police at that time?

WITNESS: Yes.

COURT: Counsel. Let me just sort of ask you to do this. I think it's sometimes impermissible to say to a witness what he didn't say. What I mean by that, you didn't tell the state police what you had for breakfast, did you? I mean, he may not have said–you don't tell the police where you were born, your mother's maiden name or whatever?

We don't want to know all of that. I mean, I am saying, you can ask a witness–and I don't mean to chastise or direct. But I think, to keep us from having a lot of objections, you can say, did you talk to the police about your meeting her? Did you tell them what happened between you? Did you tell her anything? And if you did, what was it?

(J.A. at 430–32.)

The following exchange transpired in front of the jury, before the redirect examination of Robert Betzing:

DEFENSE COUNSEL: May we approach the bench?

COURT: No.

(Witness Robert Betzing resumed the stand.)

DEFENSE COUNSEL: It's highly inappropriate. My objection is that it's highly inappropriate for a prosecutor to go out and discuss testimony with a witness after the witness has already been on the stand.

COURT: How do you know? Why is that so?

PROSECUTOR: Thank you, your honor.

DEFENSE COUNSEL: You have ordered us–you have ordered us not to discuss–

COURT: Hold it. Hold it, sir. Tell me why it is improper for a lawyer to talk to a witness?

DEFENSE COUNSEL: If this court recalls–

COURT: No. Tell me.

DEFENSE COUNSEL: When Mr. Barrios–

COURT: Tell me, sir, why is it improper for a lawyer to talk to a witness, sir?

DEFENSE COUNSEL: Your honor, I am going to tell you. Can I finish?

COURT: Yes, but don't tell me about what I did. It's improper because–

DEFENSE COUNSEL: First of all, I would refresh the court's recollection.

COURT: I don't need my recollection refreshed, sir. I don't need any refreshing of any recollection. Tell me, just why is it improper for a lawyer to talk to a witness?

DEFENSE COUNSEL: For a witness to testify, conclude their testimony, and then go outside and discuss further testimony with a lawyer and then come back into the courtroom, I find that inappropriate, your honor.

COURT: What if he had discussed it before the witness ever got on the stand? Tell me the distinction between the two, counsel.

DEFENSE COUNSEL: First of all, your honor, there is a distinction.

COURT: Tell me.

DEFENSE COUNSEL: The distinction is this. The witness has given sworn testimony in a courtroom to the best of their recollection. Then to

have an opportunity to go outside and help–and I want–

COURT: Go ahead. Say whatever you want to say. I want to hear it all. I have been a lawyer for thirty years. I spent eighteen years examining witnesses and this side [sic] and spent twelve on this bench.

I want you to tell me, sir, why it is improper for a witness, for a lawyer to talk to a witness? As a matter of plain fact, counsel, I think the best thing in the world to happen before any witness should get on the stand is for a lawyer to talk to them. And if you are a witness testifying and in subsequent discovery through conversation, something comes up germane to the case, it's imperative–supposing he is coming in here to give exculpatory evidence. Are you saying now that the prosecutor has found out some exculpatory evidence, something that does not point to the guilt of your client, that it's improper for him to recall this witness and put him on the stand?

DEFENSE COUNSEL: What I'm saying would be appropriate outside of the presence of the jury to have some discovery as to what took place out in the hallway.

COURT: Don't even start that. That is not true, sir. I don't know where you learned that rule of law.

(J.A. at 291–93.)

The following occurred during the testimony of Leanora Brun Conti, of the Michigan State Police evidence team:

COURT: Excuse me, counsel. Just so that we're all clear, when you say moved, the witness may be clear, but so that the jury is clear, you mean was it moved by people; or do you mean was it moved in the sense that it floated around? Because we've had some testimony that the body floated, by this witness' prior testimony that the body apparently was shifted around in the water, when certain photos were taken, different than what she first saw. So, when you talk about moved, do you mean moved by water, or moved by persons from one place to another, based on what she knows?

DEFENSE COUNSEL: I'll ask several more questions.

COURT: Why don't you just clear that up for me, which way did you mean when you say moved? You, when you used the word, was it moved, did it mean was it moved, were you speaking of moved by somebody, or moved by the action of the water, or you didn't know what you mean?

DEFENSE COUNSEL: Well, your honor, I didn't know that we've had any testimony that the body floated.

COURT: The witness testified when she was shown two exhibits by the people as to whether this was how the body laid when she first saw it, she said no, it had been floated [sic], it must have floated closer to the shore.

The prosecutor then had marked exhibit number twenty, showed to her, she says, yes, this demonstrates how the body was when I first arrived and saw it. Sir, that's testimony about a floating body, as I see it. At least you get that impression, that it floated because that was her testimony, wasn't that your testimony, ma'am, earlier?

WITNESS: Yes, sir.

COURT: Yeah, that sounds like floating to me, I don't know what it sounds like to you.

(J.A. at 297–98).

And during the testimony of Armando Feijoo, the following exchange took place:

DEFENSE COUNSEL: Now, does that seem like an accurate date, August fourth?

WITNESS: Yes.

DEFENSE COUNSEL: There is August 24th of '88. We had one interview in here. That was undated. Do you remember?

WITNESS: Excuse me?

PROSECUTOR: Asked and answered, your honor.

DEFENSE COUNSEL: I withdraw it. Let's move on.

PROSECUTOR: I fail to see the necessity for counsel to write things on the piece of paper.

COURT: I wish he had wrote [sic] them all down. I really wish you guys would do some of this while you are sitting around lollygagging and then you can just point it out. It would save time.

DEFENSE COUNSEL: The reason I didn't do it is not that I am lollygagging. He may not remember it and–

COURT: You, listen, Mr. –it's obvious that you want to write down ever[y] interview. You could have struck it through. It could have been done, sir. I would appreciate it. The jury would appreciate it. Time would appreciate it. Go on.

(J.A. at 367–68.) A judge must exhibit "impartiality in demeanor as well as in actions." *United States v. Frazier,* 584 F.2d 790, 794 (6th Cir.1978). By constantly criticizing, interrupting, and ridiculing defense counsel, the court neglected this responsibility.[4]

In *Nationwide Fire Insurance Company v. Ford Motor Company,* this Court stressed the problematic "appearance of partiality that arises when a judge intervenes continually on the side of one of the parties." 174 F.3d 801, 808 (6th Cir.1999). The *Nationwide* Court reversed because the judge's "interruptions were so numerous and his questions so one sided, they must inevitably have left the jury with the impression that the judge believed Nationwide's actions were egregious and improper." *Id.* Likewise, the Wayne County trial judge interfered almost exclusively with the defense presentation and assisted only the prosecution. By failing to recognize that this kind of overwhelming partiality deprived Petitioner of his constitutionally mandated right to a proceeding before a fair tribunal, *see Murchison,* 349 U.S. at 136, 75 S.Ct. 623, the Michigan courts unreasonably applied established Supreme Court precedent.

### III.

Petitioner also claims that the Michigan courts unreasonably applied established

---

**4.** Away from the jury, Judge Moore made various other questionable comments and decisions. During his post-arrest interrogation, Petitioner unequivocally invoked his right to counsel: "get me the f– out of here, I want an attorney." (J.A. at 529.) Anticipating the testimony of the interrogating officer, the prosecutor brought this to the court's attention. The prosecutor made clear that he "did not want to bring out his invocation of these rights," but the court told him to bring the evidence before the jury. (J.A. at 530–31.) Defense counsel argued that the court could not permit the jury to draw adverse inferences from Petitioner's exercise of his rights.

*See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The court said defense counsel was "dead wrong, dead wrong" and that the prosecutor should introduce the testimony "because that's the truth." (J.A. at 531–32.) Ultimately, the prosecutor did not elicit the statement. Since this exchange took place away from the jury, it should not carry much weight in this Court's analysis. *United States v. Morrow,* 977 F.2d 222, 225 (6th Cir.1992) ("Much of the concern about an otherwise inappropriate judicial act or remark is neutralized by the absence of the jury.").

Supreme Court precedent by failing to recognize that the trial court unconstitutionally interfered with his right to present a defense.

Petitioner sought to introduce evidence that Armando Feijoo's nephew, Sean Feijoo, admitted that he and Armando Feijoo killed Betzing. Sean Feijoo was a prisoner jailed with cellmate Jay Schaefer. According to the defense, Sean Feijoo told Schaefer that a woman came to Armando Feijoo's house to smoke fifty dollars worth of crack. When they realized she lacked the money, Armando Feijoo demanded that she perform certain sex acts. She refused. Sean Feijoo said that he picked up the razor they used to cut the crack and slashed her throat. Sean Feijoo claimed that Armando Feijoo shot her twice in the head, wrapped the body in a blanket and drove to the quarry. Defense counsel further indicated that Schaefer would testify he did not know Petitioner. Without hearing from the proposed witness, the trial court held the evidence inadmissible on the grounds that it lacked corroboration.

The Constitution requires that every accused have " 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). This right sometimes clashes with jurisprudential doctrines limiting hearsay evidence. The Supreme Court stressed that

> [f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or

more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed.

*Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Thus, while a defendant has the right to present a defense, the state may constitutionally limit her exercise of that right to protect its interest in admitting only trustworthy evidence.

Rejecting Petitioner's claim, the majority simply quotes from the Michigan Court of Appeals, which dispatched with the hearsay issue in this paragraph:

> When a constitutional violation is claimed, the following factors are also relevant: (1) the time when the declaration was made—how soon after the crime; (2) to whom it was made—whether it was made to someone whom the declarant would likely speak the truth; (3) the existence of independent corroborating evidence; and (4) the availability of the declarant as a witness. [*Chambers,* 410 U.S. at 300–01, 93 S.Ct. 1038.] In this case, there were no indicia of reliability. The statement was made about two years after the crime; it contained no facts which could not have been gathered from a newspaper; there was no indication that the declarant and the proposed witness were anything except cellmates [sic]; the declarant refused to testify; and there was no corroborating evidence offered. We therefore conclude that the trial court did not abuse its discretion nor den[y] defendant the right to present a defense by excluding this testimony.

*Allen,* No. 137526, at 1–2 (footnote omitted in original) (alterations in majority opinion). The majority concludes that "[t]he state court followed Chambers and careful-

ly considered the circumstances surrounding the statement, such as the time at which the statement was made, the relationship between the declarant and the proposed witness, and the existence of independent corroborating evidence."

The state court applied the correct Supreme Court precedent, *Chambers,* but did so unreasonably. First, although Sean Feijoo made the statement two years after the murder, the statement still exposed Sean Feijoo to substantial risk of criminal liability given Petitioner's trial had not yet taken place. That makes the elapsed time much less significant.

Second, there is no reason to assume that Sean Feijoo had a motive to incriminate himself by lying to Schaefer; in fact, Schaefer would have testified that he did not know Petitioner and had no prior acquaintance with Sean Feijoo. The Michigan Court of Appeals never explains why Sean Feijoo would risk his own prosecution by falsely telling Schaefer about how he (Sean Feijoo) killed someone Schaefer never met.

Third, significant corroboration exists. From the outset, Armando Feijoo's story was corroborated by the degree to which it matched his trial testimony. Both Sean and Armando Feijoo testified that Judy Betzing came over to Armando Feijoo's house and another member of his family (although he identified Luz, not Sean, Feijoo, as the third participant). More important, Justice Charles Levin, dissenting from the Michigan Supreme Court's denial of leave to appeal in this case, noted that "[i]t appears that Schaefer's proposed testimony regarding Sean's statement that he and Armando Feijoo had killed Betzing was 'corroborated' by a Michigan State Police polygraph examiner who stated that

in his opinion Schaefer was being truthful in the statements regarding information he relayed to the officer 'concerning Sean Feijoo and Armando Feijoo and Judy Betzing's homicide." ' *People v. Allen,* 448 Mich. 905, 532 N.W.2d 534, 535 (1995) (Levin, J., dissenting from denial of leave to appeal).

With respect to the fourth factor, the availability of the declarant as a witness, *see Chambers,* 410 U.S. at 302, 93 S.Ct. 1038, the Michigan Court of Appeals clearly erred. The state court claims "the declarant refused to testify" because it would have exposed him to criminal liability. But that fact militates in favor of *allowing* Schaefer's hearsay statement, not in favor of excluding it.[5] As one would expect, under Michigan Rules of Evidence 804(a) and (b), a statement against interest made by an unavailable declarant falls within a hearsay exception.

Ultimately, "the corroboration requirement ... is a preliminary question as to the admissibility of the statement, not an ultimate question as to the weight to be given to that statement." *United States v. Price,* 134 F.3d 340, 347–48 (6th Cir.1998) (considering Federal Rule of Evidence 804(b)(3), which, like Michigan Rule of Evidence 804(b)(3), states that when an out-of-court statement against penal interest is offered to exculpate the defendant, the court may only admit the testimony if "corroborating circumstances clearly indicate [its] trustworthiness"). The trial court should only prevent the jury from considering the statement's veracity if the lack of corroborating evidence suggests the statement was never made. Since the parties did not have a close relationship and Schaefer did not stand to gain from a

---

**5.** Not coincidentally, Petitioner never argues that Sean Feijoo's unavailability supports the

Michigan Court of Appeals' decision.

lie, Petitioner had a constitutional right to present the statement to the jury. *See Chambers,* 410 U.S. at 302, 93 S.Ct. 1038 ("Where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."); 4 JACK B. WEINSTEIN, WEINSTEIN'S FEDERAL EVIDENCE 804–147 (2d ed.1993) (noting that interpreting 804(b)(3) too restrictively may "create due process problems"). The trial court's failure to admit this exculpatory evidence also compels habeas relief because the Michigan Court of Appeals unreasonably applied the *Chambers* criteria. *See Chia v. Cambra,* 281 F.3d 1032, 1040 (9th Cir.2002) (finding that the exclusion of reliable exculpatory statements was error warranting habeas relief); *Rivera v. Dir., Dep't of Corr.,* 915 F.2d 280, 281–83 (7th Cir.1990) (same).

## CONCLUSION

By taking an impermissible "harmless error" approach to judicial bias, the Michigan Court of Appeals applied a constitutional standard "contrary to" established federal law as determined by the Supreme Court. The trial court both exhibited significant bias through numerous improper remarks prejudicial to Petitioner's defense and impermissibly prevented the jury from hearing significant exculpatory evidence. Given the constitutionally defective nature of Petitioner's trial, and in view of court proceedings conducted by a judge obviously intent upon securing Petitioner's conviction, it is altogether possible that Petitioner is actually factually innocent of the crime for which he received a life sentence. I therefore respectfully dissent.